## INDIANA FLOORING CO. v. GRAND RAPIDS TRUST CO.

Circuit Court of Appeals, Sixth Circuit.
June 6, 1927.

No. 4665.

**1. Contracts ⬤⟹274—On rescinding void or voidable contract substituted for valid pre-existing obligation, pre-existing valid contract is restored.**

If a voidable contract is substituted for valid pre-existing obligation, and the substituted contract is later rescinded, because void or voidable, the pre-existing valid contract is restored as if nothing had happened, since a valid contract is not extinguished by an attempt to substitute therefor an invalid one.

**2. Compromise and settlement ⬤⟹15(1)—Rescinding voidable transaction for purchase of stock at time of settlement did not affect other divisible and independent terms of settlement (Michigan Blue Sky Law).**

Where settlement, under contract to manufacture and sell maple flooring on seller's failure to make deliveries, was avoided to extent that sale of stock by buyer at such time was set aside as illegal and void under the Michigan Blue Sky Law, the exercise of such right to rescind the voidable transaction for stock did not affect the other terms relative to paying for losses sustained by buyer, and continuance in force of certain undelivered orders, which were divisible and independent, particularly as they were wholly or in part executed.

**3. Sales ⬤⟹85(2)—Contract for sale of flooring, if subject to fire clause, limiting deliveries in case of fire to proportionate percentage of orders, held enforceable only during delivery period.**

Contract for manufacture and sale of maple flooring, if subject to fire clause providing for delivery of percentage of stock equal to total orders in case of fire, would be continued in force in case of fire to proportionate extent only during delivery period, and will not be continued in force, with right to demand full delivery at date subsequent thereto.

**4. Sales ⬤⟹417—Evidence held not to authorize recovery for breach of contract to manufacture and sell maple flooring, on theory seller did not furnish proportionate percentage under fire clause.**

In action for damages for breach of contract for manufacture and sale of maple flooring, evidence *held* insufficient to justify buyer's recovery, on theory that seller failed to furnish percentage in accordance with fire clause limiting deliveries to percentage of buyer's order proportionate to total orders booked at such time.

Appeal from the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

Action by the Indiana Flooring Company against the Grand Rapids Trust Company, receiver of William Horner. Decree for defendant, and plaintiff appeals. Affirmed.

Thos. L. Zimmerman, Jr., of New York City (Travis, Merrick, Warner & Johnson, of Grand Rapids, Mich., on the brief), for appellant.

Stuart E. Knappen, of Grand Rapids, Mich. (J. T. & T. F. McAllister and Knappen, Uhl & Bryant, all of Grand Rapids, Mich., on the brief), for appellee.

Before DONAHUE and MOORMAN, Circuit Judges, and WESTENHAVER, District Judge.

WESTENHAVER, District Judge. Appellant's action is one to recover damages in the sum of $125,000 for breach of contract. It asserts a repudiation by William Horner as of January 24, 1920, of contracts to manufacture and sell maple flooring. It demands damages measured by the difference between the contract price and the market price at the time of breach. On December 31, 1921, appellee was appointed receiver of the assets and business of said Horner. On October 16, 1923, appellant intervened and filed its petition, asserting this demand, which is known in the record as claim No. 472. Issues thereon were properly framed and the cause referred to a special master. The defenses are that appellee was not indebted, that the sale contracts were canceled by mutual agreement, that all differences arising out of the same were compromised and settled by agreements duly performed, and that, if such orders existed and were not canceled, Horner was excused from performing the same because of the destruction of his mills by fire, subject to which condition the orders had been placed. The special master found against appellant, which finding was approved by the District Court, and his report confirmed, from which order of confirmation this appeal is prosecuted.

The controlling questions appear to turn on the evidence rather than on the law. The nature of these questions, as well as the proper answer, will best appear from a summary statement of the outstanding facts:

William Horner, on January 24, 1920, and prior thereto, was manufacturing and selling hardwood flooring, chiefly maple flooring. Appellant, Indiana Flooring Company, was in the business of buying and selling flooring. Many years prior to that date, and afterwards, appellant procured from its customers orders for flooring, and covered the same by placing with Horner purchase orders for corresponding quantities. The orders now in controversy are dated from May 15 to July 29, 1919. They call for quantities for 12 different customers, aggregating $1,-

218,000 feet, at prices ranging from $52.50 to $71. While different grades of flooring were to be furnished, it appears that all orders contemplated they should be kiln-dried. All orders were taken subject to this condition: "All agreements and contracts are contingent upon strikes, fires, shortage of cars, accidents, and other causes beyond our control." On May 22, 1919, appellant requested in writing that this condition be modified, so that, in case either one of the two mills Horner then had should burn, he would agree to fill appellant's orders from the other mill, without availing himself of the right of cancellation, and without modification as to shipping date. Horner, under date of May 24th, refused to accede to this modification, but added: "The only way we see we could arrange this matter would be to agree, in case of fire, to give you the percentage of our stock that would be equal to the percentage of your orders to the total orders we have booked at that time." The record is silent as to whether this modified proposal was accepted by appellant.

William Horner at this time had two mills, one situated at Newberry, and the other at Reed City, Mich. On June 29th a fire occurred, which destroyed the drying kilns and much lumber at Newberry, so that this mill could thereafter produce only air-dried lumber. On September 5, 1919, another fire occurred at Reed City, completely destroying the mill, so that it could not thereafter produce any flooring. Horner was not able to replace it and get it into production for nearly a year. He made efforts to provide substitute mills, procuring flooring elsewhere, and furnishing air-dried flooring. By October 13th he was able to get a small one-unit mill in operation at Big Rapids, and late in December one machine in operation at Reed City. At the time of the second fire, Horner was committed on orders for 16,000,000 feet of flooring, both air and kiln dried. Of these orders, appellant had placed 1,600,000 feet. Appellant, immediately after the fire, visited Horner at Reed City and advised Horner to cancel all outstanding orders, which Horner declined to do, expressing his intention to fill his orders to the best of his ability. It is, however, asserted by Horner, and denied by appellant, that the orders of Hershey Company and Aberthaw Company, now sued on, aggregating 877,000 feet, were in fact canceled. Horner continued to furnish such flooring as he had or could get, and delivered on appellant's orders, between the date of the second fire and the date of the alleged repudiation, some 630,000 feet, part of which was on orders then outstanding, and part on a new order placed by appellant at the time of this visit, for the benefit of one of its customers, the Ferguson Company.

On or about January 24, 1920, an adjustment was made between Horner and appellant. It is undisputed that the following terms were agreed upon: (1) Appellant computed certain losses it had sustained, due to its inability to get flooring from Horner, and which it had procured elsewhere at a higher price, and Horner agreed to bear $4,200 of this loss and gave a note for that amount, which was later paid. (2) All orders for flooring, placed before the second fire and not previously canceled, were to be canceled, with the exception of some five, aggregating 157,000 feet, which were to be continued in force and filled. A balance of 294,000 feet undelivered on the Ferguson order, placed shortly after the fire at a higher price, was also to be continued in force and filled. All of this flooring was thereafter delivered, or, if not delivered, was merged in a readjustment and substitution of orders made later in September, 1920. (3) Appellant agreed to sell and Horner agreed to buy 500 shares of second preferred stock, of the par value of $100 each of the Indiana Flooring Company, payment to be made during the months from May to October, 1920, both inclusive. These shares were in fact paid for, $36,000 being paid in cash and the residue in credits given by appellant, and certificates therefor were duly issued. (4) Horner agreed to furnish to appellant during the year 1920 in part or all of a total of 4,000,000 feet of maple flooring at prices which might thereafter from time to time be agreed upon. It is recited that the stock sale is made because of this promise to furnish and to fill these orders. On September 28, 1920, the parties substituted an order for 600,000 feet of maple flooring for all orders Horner then had on his books open and unshipped. The record does not clearly show what amount had been furnished since January 24th.

The third and fourth terms of the settlement above noted are embodied in a formal written agreement. The first and second are established partly by oral evidence and partly by orders and letters. Appellant's claim is that all the contracts now sued on were then in force and were then repudiated; that its damages, aggregating $125,000, are to be measured by the difference between the contract price and the January, 1920, market price; and that these damages were estimated and waived, solely because of its agree-

ment to sell and Horner's agreement to buy the 500 shares of capital stock.

The parties continued to do business after September, 1920, and probably until the receiver was appointed. Appellant filed in the receivership suit a claim against Horner for $32,750.05. It is known in the record as claim No. 235. Of this amount, $26,031.01 was for cash advanced March 1, 1921, $3,-537.54 on demand note dated July 2, 1921, and $3,001.50 on demand note dated July 15, 1921. Certain credits reduce the total to the amount claimed. The chief item of credit, $1,113.50, is the proceeds from the sale of the 500 shares of preferred stock, the certificates for which had been pledged by Horner as collateral security for these loans, and which had been sold without notice to the receiver after his appointment. Against this claim, the receiver filed a set-off and counterclaim, alleging that the original sale of 500 shares was illegal and void, because made in violation of the Michigan Blue Sky Law, and praying judgment for the amount so paid. The special master held that the sale was illegal and void, that the contract with respect thereto was severable and independent of the other promises contained in the January settlement, that it was not necessary for the receiver to tender back what had been received under these separable terms, and that as the stock had been sold and bought in by the appellant, no tender of it was necessary. The master's report was confirmed by the District Court, but no judgment was rendered in the receiver's favor for the excess of the counterclaim. This order of confirmation was without prejudice to appellant's right to file any claim it had on account of the alleged failure to fill the orders now in dispute. It was pursuant to this leave that the present claim was filed.

Appellant's theory is that the receiver's successful repudiation of the stock purchase fully restores the situation as of January 24, 1920, when the settlement was made, and that it may now sue for and recover the damages on the orders then unfilled. Appellee's contention is that the January settlement was made up of at least four promises, which are divisible or separable, and that the exercise of its right to rescind the illegal or voidable transaction for the stock does not affect the other terms, particularly as they were wholly or in part executed, and no restoration by or in favor of either party has been or could be made. In our opinion the contention of appellee is sound.

Appellant has not fully restored the purchase price of the stock; it still has not less than $20,000, not including interest. It received $4,200 in settlement of damages, which it still keeps and has never tendered back. It procured the continuance in force and delivery on orders outstanding January 24, 1920, which it was at least doubtful that it could compel Horner to fill. It procured these deliveries at an average price less than half of what it now asserts was the market price at that date. It has received large quantities of flooring on new orders placed under the January agreement. These several considerations for its release or waiver of a claim for damages cannot be ignored as insubstantial, and they have never been returned. It is no answer to say that Horner's promise in the January agreement, in so far as it related to future orders, was too indefinite, because prices yet remained to be fixed, since the fact is that orders were placed under it at fixed prices and were filled. Moreover, on September 28, 1920, an order for 600,000 feet of flooring was substituted for all previous unfilled orders, and, so far as the record discloses, this order was entirely filled.

[1] It is undoubtedly the law that, if a void or voidable contract is substituted for a valid pre-existing obligation, and the substituted contract is later rescinded, because void or voidable, the pre-existing valid contract is restored, as if nothing had happened. A valid contract is not extinguished by an attempt to substitute therefor an invalid one. But in these situations there is an indivisible valid contract, which the parties have attempted to extinguish by the substitution of an indivisible invalid contract, and when the latter is repudiated, and tender back is made of what has been received, the antecedent status is automatically restored. The authorities cited announce these rules.

[2] The situation here is different. The decree on claim No. 235 establishes merely that appellant's action in selling capital stock in Michigan, without complying with the Blue Sky Law (3 Comp. Laws 1915, § 11945 et seq.), was illegal, and the purchase voidable at the option of Horner or of his receiver. Under the Michigan law, the illegality is exclusively that of the appellant. It is the sale, not the purchase, which is made a crime. The purchaser is not a party to the illegality, but is permitted to recover back, which would not be the case if both were equally guilty, since in that situation, the law would leave the parties where it finds them. See Edward v. Ioor, 205 Mich. 617, 172 N. W. 620, 15 A. L. R. 256.

No part of the January settlement was

avoided, except the sale of stock. All other terms of the settlement have been executed, and, if not fully executed, substituted performance to appellant's satisfaction is shown. Moreover, the first and second, if not the fourth, terms of the January settlement are divisible from the stock transaction. It was so held by the special master, whose holding was approved by the District Court, and that judgment has not been appealed from. No opinion is expressed as to whether that determination of the question is res judicata. Nor is it necessary to express any opinion as to whether the order of confirmation, without prejudice to the filing of the present claim, is a modification of the master's holding. It is our opinion that the stock transaction is so far independent of the other terms of the settlement as to be divisible; particularly is this true as to terms 1 and 2. Terms 1 and 2 are not embodied in the written agreement containing terms 3 and 4. The most that can be said is that all these terms were made contemporaneously for the purpose of clearing up all outstanding differences. Terms 1 and 2 have to do exclusively with existing and past differences, while terms 3 and 4 have to do with the future business relations of the parties. It was the purpose of the former to settle and adjust Horner's obligation for past damages, as well as with respect to his obligations on all outstanding unfilled orders. Nothing appears in the written agreement embodying terms 3 and 4 to indicate that the consideration therefor was the same or dependent upon promises 1 and 2. It cannot even be said that appellant's claim for damages was so far unequivocal that Horner's promise to pay $4,200, and to continue in force and fill certain outstanding orders at a low price, was inadequate. That these several promises were divisible and independent is, we think, clearly established by the following authorities: See Page on Contracts (2d Ed.) §§ 1029, 1030, and 1035; Williston on Contracts, §§ 860, 863, 1779, 1780, and 1782.

Notwithstanding this conclusion and the fact that the decree below rests on this theory, we have examined the evidence, to determine if appellant has shown a right to recover as of January 24, 1920. From this point of view, we are persuaded that, had appellant then sued, the evidence in the record does not make out its case. As already stated, appellant's orders for flooring were placed, subject to the fire contingency clause. This contingency happened. It did not merely suspend delivery, leaving the contract in force, with a right in appellant to demand delivery after the interruption caused by such contingency had been removed. Nothing else appearing, Horner would be excused, and appellant could recover nothing. The contracts were subject to this contingency clause, not that a right of cancellation merely was thereby conferred. See Edward Maurer v. Tubeless Tire Co. (D. C.) 272 F. 990; s. c. on appeal (6 C. C. A.) 285 F. 713; New England Concrete Construction Co. v. Shepard & Morse Co., 220 Mass. 207, 107 N. E. 917.

[3] If, however, the effect of the happening of the fire, or if the proper construction of the fire clause were only such as was proposed by Horner in his letter of May 24, 1919, already stated, appellant would be entitled during the shipping period to that percentage of Horner's production which appellant's orders bore to the total orders outstanding at that time. Under this view of the contractural relations, the appellant would be entitled only to prorated deliveries. The contracts would be continued in force to this extent only during the delivery period. They would not be continued in force with a right to demand full delivery at dates subsequent to the delivery period and at a greatly enhanced price after the effects of the fire had been removed. See McKeefrey Iron Co. v. Connellsville Coke & Iron Co. (3 C. C. A.) 56 F. 212; Luhrig Coal Co. v. Jones & Adams Co. (6 C. C. A.) 141 F. 617. And if appellant got its full percentage, including therein new orders placed by it, no ground of complaint in its favor exists, even though appellee failed to give other outstanding orders their full percentage, but diverted some part of its production to the filling of new orders at higher prices. See Consolidation Coal Co. v. Peninsular Portland Cement Co. (6 C. C. A.) 272 F. 625. Hence appellant, in order to make out its case, would have to show the total amount of outstanding orders, the total production available to fill them, and the proper percentage apportionable on appellant's orders, and that the 630,000 feet it actually got was less than its proper percentage.

[4] The evidence does not furnish the necessary basis to justify a recovery on this theory. We shall not review the evidence in detail. It appears that Horner, after the fire, proposed to furnish to appellant such flooring as he could produce or obtain. At no time prior to the January settlement was Horner in a situation to deliver more than a small percentage upon his outstanding orders. The flooring contemplated by appellant's orders was to be kiln-dried, and of this

kind very little was available. The greater part shipped. after the fire to other customers was air-dried. It was the privilege of appellant to select among its customers those to whom its percentage should be shipped. It is not open to appellant to complain if it directed its entire percentage to be sent to one customer, to the exclusion of the orders now in dispute. Nor is it open to appellant to complain, if it induced Horner, after the fire, to accept a new order at a higher price, in order to accommodate some one of its customers. More than half of what appellant got went to Ferguson Company on an order placed at $75 a ton, shortly after the fire; but this new order was to take the place of prior commitments to the same company. If this were a departure from Horner's contract obligation towards all outstanding orders, it was participated in by appellant for its own benefit, and the amount received must be charged against its percentage. It is impossible to compute from the evidence in the record what, if any, lumber was owing under this theory at the date of the January settlement.

The parties, after the fire, dealt with each other on this theory of their respective rights and obligations. The evidence creates a clear conviction that appellant, in order to favor Ferguson Company, as well as to aid it in collecting insurance, directed the cancellation or disregard of the orders of the Hershey and Aberthaw Companies. The remaining orders, with two exceptions, call for shipping instructions to be furnished later. No such shipping instructions were ever given. Appellant's manager testifies that on the occasion of his visit to Reed City, shortly after the fire, he told Horner to fill all of its orders; but this is not the equivalent of definite shipping instructions, and is inconsistent with the greater weight of the evidence. The evidence discloses no specific demand by appellant that Horner should ship on account of these remaining 12 orders, and, when later in November, Hershey Company was asking appellant for some flooring, its manager tried to direct that company to a fictitious Rubicon Lumber Company, through which appellant elected to handle this business after the fire in order to aid in collecting insurance. The fact that Horner kept all orders open on his books, and made no entry of the cancellation, is not controlling, even if material. If Horner was trying to apportion his production on a percentage basis, this is what should have been done. The fact that they were not canceled, if true, would not amount to a new agreement to fill the same

after the expiration of the shipping periods, during which a percentage apportionment should be furnished. Hence, upon the issue of whether Horner was wrongfully in default January 24, 1920, as to orders now in dispute, appellant has not sustained the burden of establishing by adequate evidence the case stated in its petition.

Other contentions are urged upon us, but these are controlling. Due consideration has been given to all, but the foregoing are the only ones that call for comment. We are of opinion that appellant's claim is without merit.

The decree below is affirmed, with costs.