**TIMELY PRODUCTS, INC., et al.**

v.

**Raphael J. COSTANZO.**

**Civ. No. B–76–357.**

United States District Court, D. Connecticut.

Feb. 1, 1979.

Frederick L. Comley, Dion W. Moore, Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., Bradley B. Geist, Eban M. Graves, Brumbaugh, Graves, Donohue & Raymond, New York City, for plaintiffs.

Alfred J. Jennings, Jr., Zeldes, Needle & Cooper, Bridgeport, Conn., Barry Kramer, Kramer & Brufsky, Stamford, Conn., for defendant.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

NEWMAN, District Judge.

In this declaratory judgment action, the plaintiffs, Hines and Timely Products, Inc., seek to invalidate the agreement by which the corporation contracted to pay defendant Costanzo royalties on sales of a product in return for an exclusive license to manufacture and sell the product. Although the contract, made before the product was patented, specified that royalties would be paid on sales whether or not the patent were later invalidated, plaintiffs ask this Court to declare that the agreement is unenforceable, and that no royalties are due because one claim of defendant's patent has been declared invalid and the others have consequently been disclaimed. Defendant does not dispute the invalidity of the patent, but argues that invalidity does not defeat the contractual royalty obligation, and has therefore counterclaimed for damages equivalent to unpaid royalties and for other relief.

Defendant has moved for partial summary judgment on the central question of law in this dispute: whether the royalty obligation survives the invalidity of the patent. Defendant seeks to uphold the royalty obligation because the contract between the parties specifically provides for such survival and because the obligation is allegedly supported by valuable consideration in addition to a bare patent license to manufacture and sell the patented product. Although plaintiffs submit that summary judgment is inappropriate because of controverted fact issues, such issues as may exist are peripheral only and not material to the basic questions to be determined.[1] As a matter of law, the contractual royalty obligation under the exclusive license is unenforceable.

---

1. Plaintiffs contend that there are factual issues as to whether, as the defendant claims, the parties intended some portion of the royalties to compensate for benefits in addition to the exclusive license, and whether, as plaintiffs claim, the plaintiffs' merchandise differs from the "licensed product." However, undisputed aspects of the documents establishing the prior contractual agreements of the parties lead to the conclusion that an enforceable royalty obligation does not survive the invalidity of the patent. Were this Court to have found a surviving royalty obligation, these factual issues might well have become material to the issue of liability for royalties. Given the present ruling, it is irrelevant whether the factual disputes would be resolved in the plaintiffs' or the defendant's favor.

*Factual Background*

Plaintiff Benjamin Hines ("the investor") and defendant Raphael Costanzo ("the inventor") entered into a written license agreement dated December 27, 1965 ("the 1965 agreement") for the manufacture and sale of electrically heated socks, the subject matter of a patent application. In return for an exclusive license under the application and any subsequent patent, and for additional considerations,[2] the investor contracted to pay 10% royalties on net sales of the licensed product, subject to certain quarterly minimums. The 1965 agreement specifically provided that the investor would be obligated to pay a reduced royalty of 5% of net sales in the event that no patent issued, a successful infringement action was brought against the investor, or "any" claim in the licensed patent was held invalid. The investor thereupon organized the defendant, Timely Products, Inc. ("the licensee"), and assigned to it all his rights and interests under the 1965 agreement. Patent No. 3,293,405 ("the patent") for the inventor's "Electrically Heated Footwear" issued almost one year after the 1965 agreement was signed.

On December 22, 1969, the 1965 agreement was modified and merged into an "appendix agreement" ("the 1969 agreement"), which provided for a uniform royalty rate of 5% on sales made on or after January 1, 1969. Although the required minimum royalties were to be reduced if a successful infringement suit was brought against the licensee or "any" claim in the licensed patent were declared invalid, the 1969 agreement did not provide for a step-down in the uniform 5% rate under these circumstances, unlike the prior contract. Moreover, the 1969 agreement contained a "relation back" clause by which, if the licensee withheld royalties "for any reason," the inventor could void the 1969 agreement *"ab initio"* upon the expiration of a 30-day period. With activation of the "relation back" clause, the rights and obligations of the parties were expressly to be governed by the 1965 agreement.[3]

On September 3, 1974, in a suit brought to enforce the patent against an alleged infringer, Judge Thomas F. Murphy declared all claims of the patent invalid. *Timely Products Corp. v. Arron,* Civil No. 11,354 (D.Conn.1974), *aff'd in part, rev'd in part,* 523 F.2d 288, 296 (2d Cir. 1975). The Second Circuit affirmed the ruling as to the invalidity of one of the claims of the patent, and "set aside" the judgment as to the remaining claims that were technically not in issue. Up to the date of the District Court decision, the licensee had paid royalties due under the 1969 agreement. The licensee advised the inventor by letter dated September 25, 1974, that no obligation to pay existed as to future royalties in view of the Court's finding of patent invalidity. The inventor subsequently invoked the "relation back" clause of the 1969 agreement, the principal effect of which was to restore

2. In the 1965 agreement, the inventor granted an exclusive right and license under the patent application and any patent which might issue to make, use and sell in the United States and foreign countries the invention and other foot-warming devices embodying the heating elements and principles claimed therein (1965 License Agreement, ¶ 1). The inventor was further obligated to disclose to the investor any adaptations of the invention to other body-warming products with a 30-day period of first refusal (¶ 1); to assist and cooperate in the feasibility study of development, production and sale of the battery-heated socks (¶ 2); to consult with the investor and his engineers and manufacturers during the initial period of development, design and production (¶ 7); to render such individual consulting services as the investor may request from time to time (¶ 7); and to disclose and make further patent appli-

cations on any improvements in the invention (¶ 9).

3. The 1969 agreement also significantly altered the inventor's technical contributions to the production of the licensed product. It expressly cancelled the requirements to disclose adaptations of the heated sock invention (¶ 1); to assist in "feasibility" studies (¶ 2); and to render individual consulting services (¶ 7). The inventor argues that these obligations were cancelled because they had been fulfilled in 1965 and 1966, before the licensed product was in full production. Affidavit of Raphael J. Costanzo at 7. This factual question is relevant to the existence and nature of substantial consideration separate from the "bare" patent license, discussed *infra.*

the higher royalty and minimums provisions of the 1965 agreement.

On November 12, 1976, the inventor sought to enforce the 1965 agreement by a demand for arbitration. The licensee then filed a declaratory judgment complaint, which requested an adjudication that all claims of the patent were invalid, and an order that arbitration be enjoined. On January 13, 1977, the inventor filed a disclaimer of all the claims of his patent in the United States Patent and Trademark Office. Thereafter, the inventor filed a motion for summary judgment, conceding the invalidity of the patent and alleging additional consideration in support of the continuing royalty obligation. The licensee countered with a cross-motion for summary judgment. The motions were withdrawn upon a stipulation that the parties litigate all issues in this Court and that the demand for arbitration be withdrawn. Finally, an amended complaint, answer and counterclaim were filed, and it is upon these pleadings that the present litigation is founded.

*The 1969 Agreement*

■ Federal patent law aims to sustain a balance between two socially desirable objectives. On the one hand, the grant of a statutory monopoly encourages invention by rewarding the patentee with the sole right for a limited time to make, use and sell the patented product. On the other hand, all ideas in general circulation that are not protected by a valid patent must be dedicated to the common good in order to promote competition. *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 230–31, 84 S.Ct. 784, 11 L.Ed.2d 661 (1963); *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. 234, 237, 84 S.Ct. 779, 11 L.Ed.2d 669 (1963);

*Lear, Inc. v. Adkins,* 395 U.S. 653, 668, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1968). The appropriate balance between these policies will be maintained if a patent issues only for a genuine invention or discovery, *Cuno Engineering Corp. v. Automatic Devices Corp.,* 314 U.S. 84, 92, 62 S.Ct. 37, 86 L.Ed. 58 (1941).

The most recent Supreme Court pronouncement relevant to this case demonstrates strong opposition to state contract law that significantly undercuts, albeit indirectly, the practical means of advancing the purposes of patent law. In *Lear, Inc. v. Adkins, supra,* the Court abolished the doctrine of patent licensee estoppel [4] because the important public interest in the free use of ideas that are "in reality a part of the public domain" far outweighs the inventor's burden in defending his right to monopoly protection. 395 U.S. at 670, 89 S.Ct. at 1911. *Lear* holds not only that a licensee must always be permitted to challenge the validity of a patent but that he must also be free of any legal obstacles that remove all incentive to mount such an attack.

The contract in *Lear* had obligated the licensee to pay royalties from the date of disclosure of a trade secret, prior to issuance of a patent on that secret. The inventor, Adkins, claimed contractual royalties for the entire patent period, based on the benefit to the licensee of pre-issuance disclosure of the secret invention. The Court refused to enforce the royalty obligation during the term of the patent because doing so would undermine, as a practical matter, the abolition of the licensee estoppel doctrine.[5] As the individual who is often the only one with enough economic incentive to challenge a patent, the licensee would be deterred from attempting to prove patent invalidity if, notwithstanding

---

4. This doctrine held that so long as a patent licensee operates under a license agreement, he is estopped to deny the validity of his licensor's patent in a suit for royalties due under the agreement. *See Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 836, 70 S.Ct. 894, 94 L.Ed. 1312 (1950). The Supreme Court discussed the history of the doctrine in *Lear, supra,* 395 U.S. at 663–668, 89 S.Ct. 1902.

5. The Court stated:

Adkins' position would permit inventors to negotiate all important licenses during the lengthy period while their applications were still pending at the Patent Office, thereby disabling entirely all those who have the strongest incentive to show that a patent is worthless.

395 U.S. at 672, 89 S.Ct. at 1912.

victory, he were bound to pay the same royalty obligation on the basis of the initial trade secret disclosure. The public would continue to "[pay] tribute to [this] would-be monopolist" because the licensee had been "muzzled" for lack of a positive incentive. *Id.* at 670, 89 S.Ct. at 1911.

In its holding, *Lear* does not go so far as to invalidate an agreement that only reduces the incentive of a licensee to challenge patent validity. However, *Lear* did invalidate an agreement which, if enforced, would have left the licensee with "little incentive" to challenge the patent. *Id.* at 674, 89 S.Ct. 1902. Thus, at a minimum, *Lear* means that the policy of the patent laws must displace contract provisions which, if enforced, leave the licensee without any incentive to challenge the patent.

The inventor in this case asserts that the considerations in *Lear* are not directly relevant to the present situation. The inventor emphasizes that the confidential disclosure of his trade secret and the provision of know-how services alone justify full enforcement of the royalty obligation, and remove this case entirely from the implications of patent law policies. He bases this argument upon the holding in *Warner-Lambert Pharmaceutical Co., Inc. v. John J. Reynolds, Inc.,* 178 F.Supp. 655 (S.D.N.Y. 1959), *aff'd,* 280 F.2d 197 (2d Cir. 1960), and the dissenting opinion in *Quick Point Pencil Co. v. Aronson,* 567 F.2d 757 (8th Cir. 1978), *cert. granted,* 436 U.S. 943, 98 S.Ct. 2843, 56 L.Ed.2d 784 (June 5, 1978).

*Warner-Lambert* enforced a royalty agreement based on the use of the trade secret formula for Listerine, finding that the licensee was not relieved of his obligation to make periodic payments because the formula had been disclosed to the public. *Quick Point* involves an exclusive license agreement with a royalty step-down clause in the event of abandonment of a patent application. Although the Eighth Circuit declared the obligation inconsistent with patent policies, the dissenting judge would have enforced the contract as a trade secret licensing agreement analogous to that in *Warner-Lambert.*

These cases do not aid the inventor on the undisputed facts in this litigation. If no patent had issued to the inventor, the licensee might well have been obligated to pay the prescribed royalty rate for as long as it manufactured the licensed sock device. Although the inventor had already filed a patent application on the licensed product at the time of the 1965 agreement, the subject matter of the application was still secret, and as such could have been understood by the parties to be a protectable trade secret. Pursuant to the terms of that agreement, the licensee was bound to pay a reduced royalty rate (5% instead of 10%) in the event that a patent did not issue. Had the licensee then sought to avoid royalty payments, the hypothetical situation just described would be "on all fours" with both *Warner-Lambert* and *Quick Point.*

■ Here, however, a patent *did* issue. This critical difference is the reason why the federal patent policy articulated in *Lear* is applicable. The parties may be "free to contract with respect to a secret formula or trade secret in any manner which they determine for their best interests" consistent with applicable state law. *Warner-Lambert, supra,* 178 F.Supp. at 665. But once a patent issues, *Lear* precludes enforcement of any contract provision that eliminates the licensee's incentive to challenge the patent's validity.

■ The 1969 agreement provides for a 5% royalty rate that continues after a declaration of patent invalidity. Even if some consideration other than the patent license supports some portion of this royalty, see note 3, *supra,* the obligation cannot be enforced without eliminating the licensee's incentive to challenge the patent.

The inventor suggests the agreement provides some incentive to invalidate the patent. He points to the reduction of monthly royalty minimums in the event of patent invalidity. Although the 1969 agreement did not lower the post-invalidity royalty rate, it did provide for a 50% reduction in the monthly minimum payments due (from $700.00 to $350.00) in the event of patent

invalidity. 1969 Agreement, ¶¶ 5, 10. The inventor argues that the reduction of minimums "continu[es] the concept [implicit in the 50% post-invalidity royalty reduction of the 1965 agreement] that the patent license represented one-half the consideration for the royalty payments," and that the "know-how" aspects of the consideration constituted the other half. Defendant's Brief in Support of Motion for Interlocutory Summary Judgment, at 18 n. 6.

However, the 1969 agreement did not provide, either explicitly or implicitly, for severability of the royalty rate into halves, one for use of the patent and the other for services. On its face, the contract contemplates that all the obligations of the parties, and the consideration therefor, should be interdependent. The licensee had no reason to expect that, if the patent were declared invalid, he would be bound to pay only a 2½% royalty as opposed to 5%. Any such expectation would have been unreasonable, since the negotiations resulting in the 1969 agreement had eliminated the previous 50% discount in royalty rate. This illogical presumption does not furnish the affirmative economic incentive demanded by Lear, nor a cognizable basis for severability and partial enforcement of the royalty obligation.[6]

The inventor might further argue that the 50% reduction in monthly minimum royalty payments, in itself, provides the necessary "economic inducement to challenge" that Lear requires. This Court finds that Lear's concern for some positive monetary incentive to attack patent invalidity is not sufficiently met here. Unlike the 1965 agreement, which provides a certain and unquestionable 50% reduction in royalties, the 1969 agreement offers only the potential of an economic incentive, dependent entirely on the fluctuation of sales. If 5% of a month's net sales never fell below the pre-invalidity minimum ($700.00), the licensee would gain nothing under the contract by successfully challenging the patent. The facts of this case amply demonstrate the inadequacy of this economic inducement. At no time under either the 1965 or 1969 agreements did the applicable royalty rate result in an amount below the required minimum. See Affidavit of Benjamin M. Hines (Dec. 20, 1978).

### The 1965 Agreement

Given the unenforceability of the 1969 agreement, this Court must next determine whether the rights and obligations of the parties are reinstated as provided in the 1965 agreement and, if so, whether the licensee's duty to pay royalties pursuant to that contract is valid. The inventor claims that the 1965 agreement currently governs the parties' contractual rights, since the licensee's refusal to pay royalties under the 1969 agreement after declaration of the patent's invalidity resurrected the prior royalty obligations via the "relation back" clause.[7] To the contrary, it might be argued that nullification of the 1969 agree-

---

**6.** Under governing Connecticut law, whether a contract is treated as severable or entire is determined by a fair construction of the terms and provisions of the contract itself. The singleness or apportionability of the consideration rendered is a principal test in judging severability, and if the consideration is not expressly or by necessary implication apportioned, the contract will be construed as entire. *Haller Testing Laboratories, Inc. v. A. Lurie, Inc.,* 24 Conn. Sup. 1, 1 Conn.Cir.Ct. 342, 185 A.2d 95 (1962). Clearly, the language of the 1969 agreement neither explicitly mandates royalty division nor provides a basis for inferring one.

**7.** Defendant's Brief in Support of Motion for Interlocutory Summary Judgment, at 8, 18 n.7. The "relation back" clause of the 1969 agreement reads:

(19) Timely further agrees that it shall not withhold payment of any patent royalties from the Inventor accruing hereunder as provided in Articles 3, 5 and 6 for any reason during the term of this License Agreement, and it being further mutually agreed and understood that in the event such royalties, as provided, are withheld from the Inventor for any reason, then the Inventor may, by giving thirty (30) days' written notice to Timely, cause the terms and conditions as modified by this Appendix to be voided *ab initio* upon the expiration of such period; . . . . If this Appendix agreement is voided, the Agreement between the parties hereto immediately shall revert to the terms and conditions as expressly set forth in the original agreement of December 27, 1965 by which the rights of remedy and obligations of the

ment precludes operation of the "relation back" clause as well, and the former contract cannot be reinstated.

■ Although no reported Connecticut decision has considered the effect of a subsequent invalid contract, it is a general principle of the common law of contracts that an unenforceable substituted contract is nullified both as an executory agreement and as a discharge of a prior contract; the prior contract, if valid in itself, then becomes enforceable. See Corbin, Contracts § 1293 (1962).·

The Second Circuit has recognized that the discharge of a prior contract depends upon the intention of the parties, and a discharge will not result from a new contract where the contrary intention of the parties is apparent. *United States Navigation Co. v. Black Diamond Lines,* 124 F.2d 508 (2d Cir.), *cert. denied,* 315 U.S. 816, 62 S.Ct. 805, 86 L.Ed. 1214 (1942) (written contract did not rescind previous oral contract where the terms of the written contract were not inconsistent and the protesting party's expressly reserved rights under the oral contract at the time of signing).[8]

■ Unquestionably, the "relation back" clause expressed ·the parties' intention to

"modify" their rights and obligations under the 1965 agreement, not to relinquish them; the parties clearly intended to become accountable under the original contractual terms if either alleged a breach of the modified contract. This Court is satisfied that the unenforceable 1969 agreement does not extinguish´the parties' pre-existing obligations under the 1965 agreement, and will examine the enforceability of the reduced royalty obligation in the 1965 agreement.

Were the 1965 agreement the only contract the parties had made, the inventor would have a substantial claim to enforceability notwithstanding invalidity of the patent. Under the 1965 agreement the royalty rate drops from 10% to 5% in the event of patent invalidity, and the inventor could argue that this reduction provides a sufficient economic incentive for the licensee to contest validity. The issue then would be whether a more than trivial reduction in royalty rate in the event of invalidity sufficiently promotes the patent policies that *Lear* held must prevail over state· contract law.[9]

■ That issue need not be decided in this case, however, because the 1965 agree-

---

respective parties shall thereafter be governed.

The parties do not dispute the fact that, at least by February 4, 1976, the inventor had given the licensee timely notice of the claimed breach of its royalty obligation under the 1969 agreement. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion, at 2. The inventor alleges that he had invoked the "relation back" clause at a much earlier time, by letter dated September 20, 1974. *See* Defendant's Supplemental Submission of Documents in Support of Motion for Interlocutory Summa·ry Judgment, Exhibit A (Jan. 8, 1979). In either case, the licensee did not resume payment within the thirty-day notice period, which caused the notice to become effective according to the explicit terms of the "relation back" clause.

8. *See also Indiana Flooring Co. v. Grand Rapids Trust Co.,* 20 F.2d 63 (6th Cir. 1927); *Standard Oil Co. of California v. Perkins,* 347 F.2d 379 (9th Cir. 1965). Apparently, the Sixth Circuit does not require an unambiguous showing of intent to restore a pre-existing obligation upon nullification of a substituted contract. *Indiana Flooring, supra,* 20 F.2d at 65 ("A valid contract is not extinguished by an attempt to substitute therefor an invalid one.").

9. On the one hand, *Lear* may defeat *any* license provision that requires payment of even reduced royalties after patent invalidity, on the basis that a licensee needs the maximum possible incentive to challenge arguably invalid patents. Furthermore, there may be no principled ground on which the court could draw a line to determine the minimum discount from a royalty rate that would provide a sufficient economic incentive. *See* Amicus Brief of the U.S. Solicitor General, *Aronson v. Quick Point, supra,* quoted in BNA's Patent, Trademark & Copyright Journal No. 394 at E6. On the other hand, enforcement of a reduced royalty rate may promote both invention and the public disclosure of inventions through the issuance of patents. Secure in the knowledge that he can enforce a contract with a willing licensee for reduced royalties in the event of patent invalidity, the inventor has incentive to conceive and develop his ideas and to apply for patent protection. Furthermore, enforcement of license agreements that provide a sufficient economic incentive to challenge patent invalidity will allay the federalism concerns expressed in *Kewanee Oil Co.·v. Bicron Corp.,* 416 U.S. 470, 479 *et seq.,* 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974).

ment cannot be considered in isolation. Once the 1969 agreement was executed, the incentive for the licensee to challenge patent validity must be assessed in the context that includes both the 1965 and 1969 agreements. The 1969 agreement requires the licensee to pay royalties at a 5% rate, and even if he succeeded in persuading a court to declare that requirement unenforceable under *Lear,* he would then face the prospect of paying the stepped-down rate under the 1965 contract, which coincidentally is also 5%. The equivalency of these two rates eliminates any incentive for the licensee to attack validity of the patent and to seek to revive the reduced rate of the 1965 agreement.

Thus, on the unique facts of this case, enforcement of the royalty obligation of the 1969 agreement or the 1965 agreement would eliminate all incentive of the licensee to challenge validity of the patent, a result proscribed by *Lear.* Such provisions are therefore unenforceable by virtue of the policies of the federal patent laws. They remain unenforceable notwithstanding the fact that invalidity of the patent resulted from litigation involving a third-party infringer. Since the provisions provided no incentive for the licensee to attack the patent, they are unenforceable, and they are not revived simply because a third party obtained a declaration of invalidity before the licensee successfully made such a challenge.

Accordingly, defendant's motion for summary judgment is denied. On the existing record, it would appear that plaintiffs are entitled to summary judgment, but this Court refrains from issuing an order to that effect since plaintiffs have not filed a cross-motion for summary judgment, and defendant may have other issues to raise.