**Alexander CARUSI and Robert F. Kolec, Appellants,**

v.

**Robert LOOKER, Appellee.**

**Patent Appeal No. 7289.**

United States Court of Customs and Patent Appeals.

March 11, 1965.

William K. Rieber, Los Angeles, Cal. (George R. Jones, Washington, D. C., of counsel), for appellants.

John A. Blair, Detroit, Mich., for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

ALMOND, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority of invention to Robert Looker. Although the board granted the Carusi motion to add Kolec as a joint inventor, the party Carusi et al. will hereinafter be referred to as Carusi.

There are two counts in issue, the first of which is generic and the second specific. We do not deem it necessary to set them out herein *in extenso*. The counts define a novel form of blind rivet or fastener which, allegedly, has solved a difficult problem in the construction of sheet metal buildings, tanks, storage bins and the like. The rivets are applied from one side of a construction project and effect considerable savings in the matter of time and the elimination of labor costs and scaffolding to support workmen beneath roof sheets and on both sides of high walls. The rivets are applied and set by a pulling tool or "gun" from one side of connected sheets.

Figures 1–3 of the Looker application depict the rivet fastening operation.

The essential characteristic of the rivets, as defined by the counts in issue, resides in the fact that they have a headed sleeve 9, the shank of which projects through to the blind side of the work, and a headed pin 5 which, when pulled from the operating side, splits the shank of the sleeve into a plurality of petals (Fig. 2) that curl back until their ends engage the blind side of the work (Fig. 3), thus pulling the sheets together and providing a substantial bearing area on the blind side. This result is not achieved if the sleeve is split prior to the pulling operation. The split must progress as the pin is pulled causing the head of the pin to bend each increment of the petals outwardly as it progresses toward the head of the sleeve, thus producing the outward curl as distinguished from a simple spreading action. This makes it necessary that the underside of the pin head be tapered, as required by the counts in issue.

Looker discloses two species of the rivet, both within the scope of count 1. Carusi discloses only one species (count 2) which is characterized by notches in the end of the rivet sleeve and aligned grooves formed in the wall of the sleeve on the outside. The splitting action begins at the notches and follows the grooves which control the direction of the split. This type will be designated the notch and groove type.

The other species has a plain sleeve but the underside of the pin head has cutting edges which serve to split the sleeve. This species is disclosed by Looker only and will be designated the cutting edge type.

Looker originally filed two applications on September 9, 1955. One application [1] discloses the cutting edge type and the other application [2] discloses the notch and groove type. During the pendency of the Looker applications, in response to a requirement of the primary examiner, the two applications were consolidated in a single application.[3] The effective filing date of Looker is, therefore, September 9, 1955. The Carusi application [4] was filed February 6, 1956.

The real parties in interest are two manufacturers of headed fasteners, including various types of blind rivets. They are the Huck Manufacturing Company of Detroit, Michigan which owns the application of senior party Looker, and the Olympic Screw and Rivet Corporation of Downey, California which owns the application of junior party Carusi. These corporations will be referred to as Huck and Olympic.

Olympic refers to its product as the "Hi-clinch" rivet and Huck to its product as the "Daisy" rivet. The exhibits, designating the various rivets, introduced in evidence are physical exhibits.

The burden here rests upon Carusi, as junior party, to prove by a preponderance of the evidence his priority over Looker. Our approach to a resolution of the issues herein will proceed with an analysis and evaluation of the board's opinion in the light of the evidence adduced of record.[5] The board found that Looker had established with corroboration his conception of the notched and grooved form of the invention at least as early as February 18, 1955 and that such was conceded in Carusi's reply brief. The board stated that Carusi's sole ground of attack on the Looker proofs of conception (Exhibit 217A [6]) was that the invention there disclosed could not be credited to Looker. It found that Looker's testimony, when considered with that of witnesses who witnessed the invention disclosure, proved that Looker was not only in possession of the necessary conception on or before February 18, 1955 but that he was actively engaged in perfecting and improving it.

1. Serial No. 533,265.

2. Serial No. 533,266.

3. Serial No. 788,879, filed December 8, 1958.

4. Serial No. 563,485.

5. The board stated that the record on final hearing included over 3,500 pages of testimony and almost 500 pages of briefs. We are acutely aware of that fact.

6. A drawing showing a notch and groove rivet meeting both counts in issue.

Recourse to the record and consideration of the testimony of Looker, Matthews, Benkert and Egnot amply supports the finding of the board as to Looker's conception. The board noted that the question of whether Looker's conception of the cutting edge form of the invention was also as early as February 18, 1955, was immaterial since the notched and grooved form supports both of the counts in issue. Looker's evidence of activities from February 18, 1955 to and through his filing date relating to reduction to practice will become material only if Carusi is held to have overcome Looker's case established by his conception and filing date.

We deem it pertinent to here point out that both Huck and Olympic were suppliers or prospective suppliers of rivets to the Butler Manufacturing Company of Kansas City, Missouri. Butler was a large scale manufacturer of metal buildings and its patronage was eagerly sought by both parties as a purchaser for the rivets of the invention in issue. The technical and sales development activities of the parties during the year 1955 were keyed to serving the Butler requirements. The conception of the invention in both cases was linked to the Butler need for a blind or "topside" rivet capable of drawing together and securing overlapping sheets.

The board took occasion to point out that Looker was actively promoting the perfecting and commercialization of the notch and groove type during late February and March and of the cutting edge type from April through September; that Butler was intensely interested in the project, and that knowledge of Looker's activity reached Olympic through Butler at least as early as the latter part of August 1955, with respect to the principle of clinching through curling and petalling as defined in count 1 and embodied in the cutting edge type.

Preliminary to consideration of the Carusi testimony-in-chief, the board took cognizance of the pending motion by Carusi[7] for permission to convert his application into a joint application of Carusi and Kolec. The board, noting the close relationship between Carusi and Kolec as co-working employees of Olympic, granted the motion to convert. Kolec thus assumes the role of a joint inventor with a concomitant change of status from that of corroborating witness for Carusi.

In assaying the Carusi case, we think it conducive to clarity to delineate the facts pertaining thereto in chronological order.

It seems clear from the record that work on a pull type splitting rivet followed development of the Butler drive pin rivet[8] at Olympic. Samuel Maness, president of Olympic, testified that in December 1954 E. H. Stau, vice president of Olympic, succeeded in getting Butler "to adopt the use" of the drive pin blind rivet. He stated that "at that time" Stau called his attention to the fact that the drive pin rivet was the type which was installed with a hammer; that there was a larger potential use "for other than drive pin rivets" at Butler in sheet-to-sheet applications where the drive pin was not satisfactory because there was nothing to back it up "when you hit it with a hammer" and that Stau stated that "if we could come up" with a pull type rivet, there was a ready market for it inasmuch as "now * * * we have broken in with" Butler. Maness stated that he told Stau to go ahead and try to develop it and that in January 1955, "about a month later," Stau showed him a sample. Maness subsequently identified Carusi Exhibit 6 as the sample Stau showed him. Stau testified that after he had instructed Carusi and Kolec to develop a pull type rivet, they first came up with a Butler drive pin rivet like Carusi Exhibit 15 through which they

---

7. The examiner had deferred action on this motion.

8. A blind fastener secured not by pulling a pin as in the present invention but by driving a setting pin into a sleeve to spread legs or prongs on the blind side.

had drilled a hole to receive a pull pin and which was not satisfactory. That the pull rivet development began after the Butler drive pin development is supported by the testimony of Carusi, Kolec, and Dunham, a former employee of Olympic called as a witness by Looker. It is obvious that since the first pull type was made out of a Butler drive pin rivet, it came after the latter. While the Carusi witnesses related that this event occurred in December 1954, Looker contends that the correct date is May 1955. The date claimed by Carusi is completely unsupported by documentary evidence.

We have painstakingly reviewed the testimony of Stau, Olympic sales representative Joe Schmitz, witnesses Falk and Beckett, and numerous Looker exhibits. This evidence supports the conclusion that Olympic submitted the first sample of the Butler drive pin rivet to Butler on May 3, 1955. These samples were "turned on a lathe." Butler placed the first trial purchase order on May 11, 1955 and the first headed drive pin rivets of the Butler type were shipped by Olympic in late May 1955. The record indicates that the Butler type drive pin was neither adopted nor used by Butler nor in existence at Olympic prior to May 1955.

Looker Exhibits 44 and 332A–B disclose that the earliest Olympic catalogue sheets showing drive pin rivets list the Olympic address as 11445 South Dolan Street which was the office address only after June 13, 1955. This sheet referred to the "prices effective 6/20/55."

Since the development of the Butler drive pin rivet preceded the development of the pull type splitting rivets at Olympic, the latter development would obviously transpire after May 1955.

As noted, the Exhibit 4 rivet preceded the development of Carusi Exhibits 5 and 6. Exhibit 4 was an admitted failure and does not satisfy the counts. The testimony supported by documentary exhibits discloses that on November 3, 1955 Schmitz, acting for Olympic, arranged a demonstration of the Carusi Exhibit 4 type of fastener during the construction of a building in Kansas City. According to Maness, Exhibit 4 was developed for Butler. There appears little room for doubt that the fastener installed on the roof in Kansas City on November 3rd was like Carusi Exhibit 4. Schmitz testified that it was like Looker Exhibit 65 which appears identical to Exhibit 4. Decatur Millard, pursuant to a request from Schmitz, took photographs of the building and close-ups of the fastener on November 3rd which show the flat-headed pin and unsatisfactory petalling action of Exhibit 4. Beckett, the building contractor, was present when the rivets were installed and stated that the rivets installed were identical to Carusi Exhibit 4. He produced and identified his "Labor Breakdown Report" showing that the roof was applied on November 3, 1955. Looker Exhibit 98A and B, a letter from Wilson to Schmitz dated November 7, 1955, states that it was difficult to insert the head of the pin through the holes in the sheets, stating further that:

"Perhaps the pin diameter can be decreased and also the end of the pin be rounded or tapered so that it might be presenting a lead into the holes. * * * "

This is an apt reference to the flat-headed pin of Exhibit 4. If a more successful version had been developed at that time, it hardly seems likely that an admitted failure would have been submitted to Butler for a test on November 3, 1955.

The next fastener in the Olympic sequence is Exhibit 5. Looker Exhibit 323 is a letter dated November 23, 1955 from Schmitz of Butler to Falk of Olympic, discussing the results of a test. The following portion of this letter is significant:

"The big trouble that we had was that in many instances due to the *balled head* the spread of the rivet was not outward but tended to curl in, consequently, we did not get a tight clinch nor a satisfactory spread. By eliminating chamfer on the rivet shank or better yet, by inverting the chamfer we should eliminate this problem as then the

rivet should be able to ride up and over the rounded section and give us the proper spread." (Emphasis added.)

Relating back to Wilson's letter, Looker Exhibit 98A and B, criticizing what appears to be Exhibit 4, we note that Exhibit 5 has the "balled" or rounded pin head suggested by Wilson after difficulty had been encountered in inserting the flat-headed Exhibit 4. In addition to the "balled head" evidently suggested by Wilson, Schmitz is suggesting a chamfer to aid the sleeve in riding up over the pin head.

It appears that a test of Exhibit 6 must have been conducted on or about December 29, 1955. Wilson, in reporting a test he, Beckett and Schmitz had conducted on that date, said:

"The latest rivet has a filleted pinhead which petals out the indented rivet sleeve very quickly for a long material engaging range."

The filleted pin head comports with the head of the pin in Exhibit 6. It is more than likely that Wilson was referring to Exhibit 6. The sequence of the tests of the three types in November and December 1955 is not only logical but also finds support of record. In its effort to secure the Butler patronage, it is not reasonable to assume that Olympic would submit defective samples like Carusi Exhibits 4 and 5 after overcoming the defects with the improved Exhibit 6 fastener.

There can be no doubt that the fastener in issue was developed to meet a need of Butler for a sheet-to-sheet topside fastener. This much is clear from the testimony of Maness, Kolec and Stau. Maness testified that he was hopeful that sales of the new fastener to Butler would improve Olympic's financial condition. Butler was pressing Olympic for a satisfactory topside fastener and was enthusiastic over the Huck fastener of the type in issue in early March 1955. It is difficult to believe, under these circumstances, that the new fastener would not have been submitted to Butler at the earliest possible moment if such a fastener existed.

Roger Hield, a Butler project engineer, had been assigned the job of finding a satisfactory topside fastener for Butler. He worked with many fastener manufactures for about a year from late 1954 up to the end of August 1955. Schmitz, the Olympic sales representative, contacted him when he made his first call on Butler on December 3, 1954. Hield testified that he had no recollection of ever talking to any Olympic representative in 1955 regarding a petalling topside fastener. Hield was given another assignment in late August 1955 and was succeeded by Billie R. Wilson. After that date, however, he continued to work on topside fastener problems with Wilson as late as November 1955. Stau testified that he showed Billie Wilson the Olympic fastener in March 1955. Wilson, on the other hand, testified that he had occasion to consider an Olympic rivet which split when pulled from the topside *after* he took over Roger Hield's job, and he placed that as sometime in the summer of 1955. Wilson identified Carusi Exhibit 4 as the first Olympic rivet of the splitting pull type, of a whole series of such rivets, including Carusi Exhibit 11.

Lloyd Jones, another Butler man, to whom Stau claimed to have shown Carusi Exhibit 11, could recall no work on the Olympic fastener in issue in 1955. Jones produced the first purchase order to Olympic for such fasteners which was dated January 10, 1956. He also recalled the Huck rivets of the type in issue in 1955.

Stau claims to have disclosed Carusi Exhibit 11 to Wilbur Larkin. Larkin couldn't recall when he first saw an Olympic blind rivet which split when pulled but he did recall that it was *after* he had seen Huck rivets of that type.

We find no corroboration of Stau's testimony that he disclosed Exhibit 11 to Butler in March 1955. The testimony of

the Butler witnesses clearly refutes Stau's testimony.

In the interest of clarification, we point out that Carusi Exhibits 4 and 5 represent fasteners which were admittedly unsatisfactory and which failed to support the counts in issue. Exhibit 6 does not have the notches called for by count 2 and hence does not support that count. Neither Exhibit 4 nor 5 conforms to the counts since neither has "an inclined annular surface on the underside" of the head portion to produce *"reversely curved locking fingers* extending radially outwardly of said tubular member for engagement at their free ends with one side of said structural member * * *." (Emphasis supplied.)

An exhaustive review of this voluminous record clearly sustains the view expressed by the board that:

> "The matter of when or whether Carusi conceived the invention in issue independently of Looker is shrouded in uncertainty, due to conflict of testimony and lack of pertinent or persuasive documentary evidence. * * *"

Carusi's case depends upon purely oral testimony relating to events occurring more than six years prior to such testimony. We find no documentary support identifying the invention in issue covering phases and critical periods vital to Carusi's contentions. Whatever semblance of a prima facie case which may be attributed to Carusi has been overwhelmingly rebutted by evidence adduced by Looker through records of Olympic and Butler obtained by resort to subpoena duces tecum and the testimony of Schmitz, Beckett, Millard, Falk, Dunham, Tucker and others previously herein alluded to.

We find no drawings, sketches, correspondence or any record of material bearing and substance relevant to the conception, making or testing of the rivets critical to the counts in issue. It is a circumstance of striking significance that this corporate development so important to the Olympic enterprise would be carried on without any semblance of supporting documentary evidence, such as purchase orders, invoices, work orders, drawings, correspondence and related entries on Olympic records. That it was the practice of Olympic to keep corporate records relating to its productions is evidenced by the documentation pertaining to the drive pin developments which occurred prior to any work on the fastener in issue. Of added significance is the affidavit executed by Maness in support of a motion to extend the time for filing preliminary statements. This affidavit embodied Maness' statement under oath that he possessed "a large portion of the documentary evidence" relating to the development of the "subject in issue." Such "documentary evidence," so vital to Olympic's case, was never produced.

We agree in substance with the evaluation placed by the board on the testimony of Carusi, Kolec and their corroborating witnesses that there is great discrepancy in dates and alleged documents between the testimony and the sworn preliminary statements; that nothing of a contemporaneous nature is produced for comparison to establish dates "which are remarkable for the fact that they are just early enough to overcome those asserted by Looker as then known from his Preliminary Statement"; that the substance of the invention had become well known through subsequent developments and that under such circumstances oral testimony may well become untrustworthy by reason of a potential danger that witnesses may confuse subsequent with pre-acquired knowledge.

Carusi relies on the case of Taylor v. Beverage, 73 F.2d 639, 22 CCPA 784, relating to the competency of oral testimony, wherein the court said:

> "Appellees make the point that the oral testimony in behalf of appellant was given * * * more than six years after the events testified to occurred, and invoke the rule that such testimony should be weighed with extreme caution. This

is a salutary rule, which has often been applied by the courts, but the rule does not require that oral testimony shall be disregarded solely because given many years after the taking place of the event to which the testimony relates."

We take no exception to the rule stated in Taylor, where the factual situation is readily distinguishable from the case at bar. We are not here dealing with the nature of events, as in Taylor, but with critical dates alleged by Carusi which have been refuted by opposing testimony or, as found by the board, shown to be "almost certainly erroneous." The record here, in our view, supports the conclusion of the board that:

" * * * testimony in chief for Carusi is almost certainly erroneous as to dates, and this conclusion is based not alone on the testimony of Falk, Schmitz, Wilson and others indicating that these developments did not take place when alleged, or took place from nine months to a year after the dates alleged, but primarily on documentary evidence which constitutes strong circumstantial support of this contention. This documentary evidence has not been denied or controverted in Carusi's behalf, and it shows that Olympic was actively promoting fasteners like Exhibit 4, which were said by Stau, Carusi and Kolec to have been found unsatisfactory in January 1955, at a date as late as November 1955; that fasteners like exhibit 5 were promoted at a still later date; and that replacement of this promotion by that of Exhibit 6, which was the first successful rivet and the first Olympic rivet conforming to either count, occurred still later, *at a date a number of months after Looker's filing date.* (Emphasis board's.) * * * "

We consider apposite here the language of MacGregor v. Johnston, 71 F.2d 165, 21 CCPA 1216, quoted with approval by this court in Chandler v. Mock, 150 F.2d 563, 32 CCPA 1183. The court said:

"The memories of men are too treacherous to admit of blind reliance upon them, and of all the records which it seems that the appellant * * * might have produced in the way of documentary evidence, tending to support the alleged dates, nothing really helpful was produced. It seems to have been a case in which the effort was to see how little, rather than how much, could be proven."

Carusi contends that the testimony on behalf of Looker as to his invention of the fastener in issue should be disregarded because it is not shown that he is the sole inventor. It is asserted that one Frank Dobbe was the sole inventor or a joint inventor with Looker. Our study of the relevant portions of the record relating to this issue fails to convince us of error on the part of the board. The board stated: (citations omitted)

"Looker was in possession of a conception of the invention on or before February 18, 1955, and proof of that fact is sufficient. However, it may be stated parenthetically that we have examined the exhibits and testimony relied upon by Carusi to prove that Dobbe was the inventor or co-inventor, and find no substance to this contention."

For the reasons stated, we find no error in the decision of the board that "on the basis of the total record * * * Carusi has not sustained the burden of proving either that he conceived it [the invention] before February 18, 1955 or reduced it to practice before September 9, 1955." The decision of the board awarding priority to Senior Party Looker is affirmed.

Affirmed.