**STUDIENGESELLSCHAFT KOHLE, M.B.H., Plaintiff–Appellant,**

v.

**SHELL OIL COMPANY, Defendant/Cross–Appellant.**

No. 96–1079.

United States Court of Appeals, Federal Circuit.

May 5, 1997.

Rehearing Denied; Suggestion for Rehearing In Banc Declined June 27, 1997.

Nathanial D. Kramer, Sprung Horn Kramer & Woods, Tarrytown, NY, argued, for plaintiff-appellant. With him on the brief was Arnold Sprung.

John D. Norris, Arnold, White & Durkee, of Houston, TX, argued, for defendant/cross-appellant. With him on the brief were John D. Norris and Russell L. Sandidge. Of counsel on the brief were A.M.T. Finch, Jr. and Dean F. Vance, Shell Oil Company, Houston, TX.

Before RADER, SCHALL, and BRYSON, Circuit Judges.

RADER, Circuit Judge,

The United States District Court for the Southern District of Texas determined that claims 1–6 and 14 of U.S. Patent No. 4,125,-698 ('698 patent) are invalid, and that infringement of claim 13 by Shell Oil Company's (Shell) polypropylene operations and infringement of claims 7, 9–12, and 15 by Shell's polybutylene operations were not properly before the court. Studiengesellschaft Kohle m.b.H. (SGK), the owner of the '698 patent, appeals these decisions. Further, the district court certified the following question under 28 U.S.C. § 1292(b) (1994):

> Where the Court has found the relevant patent claims invalid, may the Licensor recover damages for breach of contract for past royalties due on processes allegedly covered by such claims, from the date of the alleged breach until the date that the Licensee first challenged validity of the claims?

Because an applicant cannot combine multiple prior applications to obtain an earlier filing date for an individual claim, this court affirms the district court's invalidity holding. Because infringement involving claim 13 and Shell's polybutylene operations was properly before the district court, this court reverses and remands. Finally, this court answers the certified question in the affirmative.

## I.

SGK is the licensing arm of a famous, non-profit research and educational organization in Germany—the Max–Planck Institute for Coal Research. The '698 patent is part of a family of patents filed by Professor Karl Ziegler, a Nobel laureate and past director of the Max–Planck Institute, and various co-

inventors. Ziegler and his co-workers initially discovered that combinations of reducing agents (most notably organoaluminum compounds) and heavy metal compounds would polymerize ethylene to form high molecular plastics. Ziegler extended this discovery to the polymerization of higher members of the ethylene series, such as propylene and butene. Ziegler, et al. filed the 770,484 application, which matured into the '698 patent, on October 29, 1958.

In another case, this court categorized the '698 patent as a continuation-in-part (CIP) because it was not limited to a single parent application. *See Studiengesellschaft Kohle mbH v. Northern Petrochemical Co.,* 784 F.2d 351, 352, 228 USPQ 837, 838 (Fed. Cir.1986). The 770,484 CIP application, which was filed on October 29, 1958, combined Ziegler's 482,412 application, filed January 17, 1955, with his 514,068 application, filed June 8, 1955. On December 6, 1955, over a year before the filing of the 770,484 application, Belgian Patent No. 538,782 (the Belgian Patent) issued. Claims 1–6 and 14 of the '698 patent, both parties agree, cover a process disclosed in the Belgian Patent.

Shell and SGK first entered into an agreement involving the Ziegler family of patents in 1974. Under that agreement, SGK licensed Shell to polymerize propylene under the Ziegler patents. When the '698 patent issued in 1978, the 1974 agreement already authorized Shell to practice the claimed process. In 1987, after several disputes over this license, Shell and SGK renegotiated the license only with regard to the '698 patent. The new terms provided Shell a paid-up license to produce 450 million pounds of polypropylene per year, with a 1.5% running royalty on any polypropylene sales in excess of 450 million pounds. Further, the amended agreement obligated Shell to give a yearly accounting of its entire polypropylene production. In that yearly accounting, Shell was to "specify the amount of Polypropylene produced which it considers as falling outside of the license and ... provide SGK, in confidence, with sufficient information to allow SGK to independently evaluate whether or not said production is, in fact, outside of the scope of the license."

In 1987, Shell also began producing polypropylene by an alleged new process in Seadrift, Texas (the Seadrift Process). Because Shell contended that the '698 patent did not cover the Seadrift Process, Shell did not pay royalties on polypropylene produced by that process. Moreover, in its yearly accountings to SGK, Shell did not disclose its production of polypropylene by the Seadrift Process.

Ultimately, SGK terminated Shell's license and brought an action for unpaid royalties from 1987 through 1993. Additionally, SGK set forth claims for infringement of the '698 patent for the period 1993 through 1995. Shell moved for summary judgment of invalidity of claims 1–6 and 14 of the '698 patent based on anticipation by the Belgium patent. SGK responded by arguing that the '698 patent is not anticipated because it is entitled to an earlier filing date than the Belgian patent. To arrive at this earlier filing date, SGK relied on 35 U.S.C. § 120 (1994) to combine the disclosures of the two earlier patent applications (the 482,412 application and the 514,068 application).

The district court held that section 120 does not permit the combination of two earlier disclosures to acquire an earlier filing date, because "an earlier application must comply with the requirements of § 112 for each claim that seeks the benefit of the filing date of that earlier application." As none of the parent applications alone describes the invention recited in claims 1–6 and 14 of the '698 patent, the district court held that these claims were only entitled to the filing date of the continuation-in-part application (October 29, 1958). Thus, the district court determined that the Belgian Patent anticipated claims 1–6 and 14 of the '698 patent, and, therefore, granted summary judgment of invalidity under 35 U.S.C. § 102(b).

The district court further ruled that the only matter remaining before it was SGK's claim for royalties under the parties' license. In that regard, the district court held that a licensor could recover damages for breach of a license agreement where the validity of the underlying patent was not challenged until after the breach occurred. The district court certified the question of whether the invalidity determination on claims 1–6 and 14 would

affect plaintiff's claim for unpaid royalties for the period before Shell challenged the validity of the patent.

## II.

On appeal, SGK contends that the district court erred in concluding that the disclosures of two earlier filed applications cannot be combined to acquire an earlier filing date under 35 U.S.C. § 120, and in granting summary judgment of invalidity based on that ruling. This court reviews issues of statutory interpretation *de novo*. *See In re Carlson*, 983 F.2d 1032, 1035, 25 USPQ2d 1207, 1209 (Fed.Cir.1992). Additionally, this court reviews a grant of summary judgment *de novo*. *See Winner Int'l Corp. v. Wolo Mfg. Corp.*, 905 F.2d 375, 376, 15 USPQ2d 1076, 1077 (Fed.Cir.1990).

Section 120 sets forth the requirements for a patent application to receive the benefit of the earlier filing date from a prior application:

An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States ... which is filed by an inventor or inventors named in the previously filed application shall have the same effect, as to such invention, as though filed on the date of the prior application ... if it contains or is amended to contain a specific reference to the earlier filed application.

35 U.S.C. § 120. To qualify for an earlier filing date, section 120 requires, *inter alia*, that the earlier-filed U.S. patent application contain a disclosure which complies with 35 U.S.C. § 112, ¶ 1 (1994) for each claim in the newly filed application. Thus, this benefit only applies to claims that recite subject matter adequately described in an earlier application, and does not extend to claims with subject matter outside the description in the earlier application. *See Waldemar Link,*

*GmbH & Co. v. Osteonics Corp.*, 32 F.3d 556, 558–59, 31 USPQ2d 1855, 1857 (Fed.Cir. 1994). In other words, a claim complies with 35 U.S.C. § 120 and acquires an earlier filing date if, and only if, it could have been added to an earlier application without introducing new matter. *See Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1566, 28 USPQ2d 1081, 1088–89 (Fed.Cir.1993).

Under 35 U.S.C. § 112, ¶ 1, and consequently under 35 U.S.C. § 120 as well, an applicant must "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention." *Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563–64, 19 USPQ2d 1111, 1117 (Fed.Cir.1991). An applicant cannot show possession of an invention based upon a combination of several distinct previous applications unless he shows that one of the applications discloses the invention. *See Application of Scheiber*, 587 F.2d 59, 199 USPQ 782, 785 (CCPA 1978) (Baldwin, J., concurring). In other words, a claim that relies upon a combination of previously-filed applications is not to be entitled to an earlier filing date because the applicant has not demonstrated possession of the complete invention at the time of an earlier application. *Id.* 199 U.S.P.Q. at 785 ("[A]ppellant is asking [the court] to make the decision that various bits of his claimed invention are supported in the parent applications.... The majority opinion properly rejects this approach."). In sum, 35 U.S.C. § 120 requires an applicant to meet the disclosure requirement of § 112, ¶ 1 in a single parent application in order to obtain an earlier filing date for individual claims.

Appellant relies on *Ex Parte Janin,* 209 USPQ 761 (PTO Bd.App.1980) for the proposition that parent applications may be combined to support a later claim.* In *Janin,* the Board allowed the appellant to rely

---

* SGK additionally relies on *Carusi v. Looker,* 52 C.C.P.A. 1093, 342 F.2d 112, 144 USPQ 670 (CCPA 1965). *Carusi,* however, provides no support for this proposition. First, *Carusi* dealt with conception and reduction to practice in an interference case, rather than 35 U.S.C. § 120. The PTO had previously allowed Looker an earlier effective filing date, but that decision was not challenged on appeal. Second, the prosecution history shows that Looker had successfully added the claim at issue to one of his parent applications, prior to the filing of his CIP application, without raising a 35 U.S.C. § 112 rejection. Thus, one of the parent applications alone must have contained sufficient disclosure to meet the 35 U.S.C. § 112, ¶ 1 standard.

on the combined disclosure of two parent applications to support a single claim in a later-filed application. The Board distinguished that case from the situation in *Scheiber*: "[H]ere, the basic process and claimed improvement is disclosed in each of the parent applications and it is only in considering the basic starting materials that we have to direct our attention to separate applications to find adequate support." *Janin*, 209 USPQ at 764. *Janin* attempts to distinguish the situation where one patent application discloses most of the claimed invention and the other application only provides one small aspect to complete the claimed invention from a situation where both parent applications contain "various bits and pieces" of the claimed invention. *Id.* The application in *Janin* comes far closer to meeting the § 112, ¶ 1 standard than did the application in *Scheiber*. Nevertheless, Janin's application did not satisfy that standard, despite the Board's allowance of an earlier filing date. The claims at issue in *Janin* were not completely supported by the disclosure of any one parent application, and, thus, could not meet the § 112, ¶ 1 requirement. *Id.* ("[W]e recognize support for the subject matter of claim 13 is dependent upon the combined disclosures of both parent applications."). Accordingly, this court finds unpersuasive the Board's attempt in *Janin* to limit the holding of *Scheiber* and circumvent the § 112, ¶ 1 standard. Thus, this court affirms the district court's ruling that the disclosures of two earlier filed applications cannot be combined to acquire an earlier filing date under 35 U.S.C. § 120.

SGK concedes that it could not add the '698 patent claims to either the 482,412 or the 514,068 applications without introducing new matter. Specifically, the 482,412 application disclosed only the polymerization of ethylene olefins, while the '698 patent claims polymerization of a broader class of alpha-olefins. Similarly, the 514,068 application disclosed the use of catalysts from a narrower group of metal compounds than the '698 patent. Neither the 482,412 nor the 514,068 application alone shows complete possession of the invention claimed in the '698 patent. Because individual claims of the '698 patent could not have been added to any single,

previously-filed application, the '698 patent is not eligible for an earlier filing date. Based on its original filing date, the '698 patent is anticipated by the Belgian Patent.

This court, consequently, affirms the district court's grant of summary judgment of invalidity under 35 U.S.C. § 102(b) of claims 1–6 and 14 of the '698 patent. Additionally, because claims 1–6 and 14 are invalid, this court need not reach the issue of claim construction with regard to these claims.

### III.

In its order holding claims 1–6 and 14 invalid, the district court stated:

> The Court ORDERS that Defendant Shell Oil Company's Motion for Summary Judgment That claims 1–6 and 14 of U.S. Patent No. 4,125,698 Are Invalid is GRANTED. Defendant Shell's Motion for Summary Judgment of Noninfringement of U.S. Patent No. 4,125,698 is DENIED as moot. Trial will proceed on Plaintiff Studiengesellschaft Kohle's claim for breach of contract.

The district court declined to rule on infringement of claim 13 by Shell's polypropylene operations and infringement of claims 7, 9–12, and 15 by Shell's polybutylene operations.

Looking first at claim 13, SGK alleges infringement of the '698 patent in its complaint, without specifying any particular claims. The complaint states that SGK "elects to treat defendant's [Shell's] manufacture of polypropylene as an infringement of plaintiff's [SGK's] U.S. patent 4,125,698." At no point did SGK express an intent to drop its assertion that Shell infringed claim 13. Nevertheless, Shell alleges that SGK implicitly dropped claim 13 from the suit when it failed to reassert that claim after Shell's "dispositive" summary judgment motion.

Shell's summary judgment motion sought a judgment of noninfringement of claims 1–6 and 14 of the '698 patent. Resolving this motion, the trial court stated: "Defendant's motion for summary judgment is granted. Shell Oil Company has not infringed U.S. Patent No. 4,125,698." SGK, after Shell's

motion, reasserted infringement of claims 7, 9–12, and 15 by Shell's polybutylene operations, but did not reassert infringement of claim 13 by Shell's polypropylene operations. SGK, however, did not state that infringement of claims 7, 9–12, and 15 by the polybutylene operations were the only issues remaining in the suit. The record does not reveal, nor does the district court offer, any valid reason for declining to consider the claim 13 infringement question. This court determines that infringement of claim 13 remains before the district court. On remand, the district court will have an opportunity to address this claim.

Next, this court considers the issue of infringement of claims 7, 9–12, and 15 by Shell's polybutylene operations. In its final judgment, the district court perceived "no claim before the Court raising the question of whether any of the defendant's polybutylene operations infringe U.S. Patent 4,125,698." SGK purports to have added infringement by Shell's polybutylene operations to the pleadings by operation of law.

■■■ With regard to amendments by operation of law under Fed.R.Civ.P. 15(b), this court applies the law of the regional circuit. *See Biodex Corp. v. Loredan Biomedical, Inc.,* 946 F.2d 850, 856, 20 USPQ2d 1252, 1258 (Fed.Cir.1991). The Fifth Circuit reviews the denial of a motion to amend pleadings for an abuse of discretion. *See Norman v. Apache Corp.,* 19 F.3d 1017, 1021 (5th Cir.1994); *Avatar Exploration, Inc. v. Chevron, U.S.A.,* 933 F.2d 314, 320–21 (5th Cir.1991). An appellate court, however, may set aside a discretionary decision which rests on an erroneous interpretation of law or on clearly erroneous factual underpinnings. *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1039, 22 USPQ2d 1321, 1333 (Fed.Cir.1992) (in banc).

When declining to address infringement of the '698 patent by Shell's polybutylene operations, the district court stated that the claim involving polybutylene appears for the first time in the joint pretrial order. To the contrary, the record reveals that the polybutylene claim first appears in Plaintiff's Memorandum in Opposition to Defendant's Mo-

tion for Summary Judgment. In fact, Shell recognized and opposed SGK's introduction of the issue. Thus, the district court clearly erred in finding that SGK only introduced the polybutylene issue at the pretrial order stage.

■■■ Further, despite the district court's contrary statement, a plaintiff may—under some circumstances—introduce a new cause of action through its pretrial order. Fed. R.Civ.P. 15(b) permits, with the express or implied consent of the parties, the trial of issues not raised by the pleadings. Although this court is unaware of any Fifth Circuit Court of Appeals case law directly addressing introduction of a new cause of action through a pretrial order, *but see Marsh Inv. Corp. v. Langford,* 620 F.Supp. 880, 883 (E.D.La.1985); *Silver v. Nelson,* 610 F.Supp. 505, 520 (E.D.La.1985), the Fifth Circuit has advocated a liberal policy toward allowing such amendments, *see Mineral Indus. & Heavy Const. Group v. Occupational Safety and Health Review Comm'n,* 639 F.2d 1289, 1292 (5th Cir.1981). Additionally, other circuits have permitted introduction of new causes of action through both stipulations and pretrial orders. *See Blackwell v. Regal Cab Co.,* 316 F.2d 398, 399–400 (D.C.Cir. 1963); *Bucky v. Sebo,* 208 F.2d 304, 305 (2d Cir.1953); *see also* 3 James Wm. Moore, *Moore's Federal Practice,* ¶ 15.13[2] (2d ed.1996). Because the district court erred in overlooking the Fed.R.Civ.P. 15(b) procedure, and clearly erred in finding that SGK delayed raising infringement by Shell's polybutylene operations until the pretrial order, this court reverses, and remands the issue of infringement of claims 7, 9–12, and 15 for further consideration.

## IV.

■■■ The district court also certified a question concerning the effect of an invalidity finding on unpaid royalties. *See* 28 U.S.C. § 1292(b) (1994). According to the 1987 licensing agreement, Shell agreed to pay SGK a 1.5% running royalty on the sale of any polypropylene, produced with a heavy metal catalyst as defined in claim 1 of the '698 patent, in excess of 450 million pounds per

year. Further, as discussed above, this agreement obligated Shell to give a yearly accounting of its entire polypropylene production, specifying "the amount of Polypropylene produced which it considers as falling outside of the license." The agreement obligated Shell to provide SGK with sufficient information to allow independent evaluation of whether its production falls outside the scope of the license. The record shows that Shell breached this contract by producing polypropylene under the Seadrift Process, without either paying royalties or reporting the production as outside of the license.

Nothing in this license made payment of royalties contingent upon the validity of the '698 patent. Setting aside momentarily both federal patent law and policy, this contract—regardless of the patent's validity—obligates Shell to pay royalties on polypropylene produced in accordance with claim 1 of the '698 patent. In other words, contract law governs the enforcement of the license. Enforcement of these contract terms is not contingent upon validity of the patent which defines the subject matter of the license. Assuming that the Seadrift Process infringes claim 1 of the '698 patent and thus fits within the terms of the license, Shell breached the license by failing to pay royalties. Enforcement of the license, if the Seadrift Process infringes the '698 patent, would require Shell to pay back royalties.

With a patent licensing agreement at stake, this court examines the contract for rare, but potential, conflicts between state contract law and federal patent law. For example, in *Lear v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), the Supreme Court prevented the enforcement of a valid royalty payment agreement to facilitate a determination of patent validity. Specifically, the Supreme Court declined to estop a patent licensee from contesting the validity of the licensed patent. *See id.* at 674, 89 S.Ct. at 1913; *Cordis Corp. v. Medtronic, Inc.,* 780 F.2d 991, 995, 228 USPQ 189, 191–92 (Fed.Cir.1985). In tones that echo from a past era of skepticism over intellectual property principles, the Court in *Lear* feared that

> [l]icensees may often be the only individuals with enough economic incentive to chal-

lenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification. We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest....

*Lear,* 395 U.S. at 670, 89 S.Ct. at 1911. Thus, in examining the interface between national patent policy and state contracts, the Supreme Court requires this court to consider "whether overriding federal policies would be significantly frustrated" by enforcing the license. *Id.*

This court encountered the *Lear* test when an assignor-inventor and his company sought to defend against an infringement action by challenging the validity of the assigned patents. *See Diamond Scientific Co. v. Ambico, Inc.,* 848 F.2d 1220, 6 USPQ2d 2028 (Fed.Cir. 1988). With careful consideration of the *Lear* test and policies, this court nonetheless estopped the assignor from challenging the validity of the patent:

> To allow the assignor to make that representation [of the worth of the patent] at the time of the assignment (to his advantage) and later to repudiate it (again to his advantage) could work an injustice against the assignee.... [D]espite the public policy encouraging people to challenge potentially invalid patents, there are still circumstances in which the equities of the contractual relationships between the parties should deprive one party ... of the right to bring that challenge.

*Diamond Scientific,* 848 F.2d at 1224–25. Indeed, in several other settings, this court has distinguished *Lear. See, e.g., Foster v. Hallco Mfg. Co.* 947 F.2d 469, 476–77, 20 USPQ2d 1241, 1246–47 (Fed.Cir.1991) (*Lear* does not bar enforcement of settlement agreement and consent decree); *Sun Studs, Inc. v. ATA Equip. Leasing, Inc.,* 872 F.2d 978, 991–93, 10 USPQ2d 1338, 1349–51 (Fed. Cir.1989) (*Lear* does not bar enforcement of contract promise to share royalties); *Hemstreet v. Spiegel, Inc.,* 851 F.2d 348, 350–51, 7 USPQ2d 1502, 1504 (Fed.Cir.1988) (*Lear* does not bar enforcement of settlement

agreement to pay royalties even if patent later held invalid).

As in *Diamond Scientific,* this court detects no significant frustration of federal patent policy by enforcing the 1987 license agreement between Shell and SGK, to the extent of allowing SGK to recover royalties until the date Shell first challenged the validity of the claims. First, as in *Diamond Scientific,* Shell executed a contractual agreement which produced significant benefits for the corporation and attested to the worth of the patent. Under the agreement (with its provision for Shell to notify SGK of all polypropylene production), Shell had the benefits of producing polypropylene insulated from unlicensed competition, insulated from investigations of infringement, and even insulated from royalties (until SGK's discovery of the Seadrift Process). To these benefits, Shell now seeks to add the benefit of abrogating its agreement and avoiding its breach of the contract. Following the reasoning of *Diamond Scientific,* this court must prevent the injustice of allowing Shell to exploit the protection of the contract and patent rights and then later to abandon conveniently its obligations under those same rights. *See Diamond Scientific,* 848 F.2d at 1224–25; *see also Cordis Corp.,* 780 F.2d at 995 (quoting *Warner–Jenkinson Co. v. Allied Chem. Corp.,* 567 F.2d 184, 188, 193 USPQ 753, 757 (2d Cir.1977) ("It would not be fair for the [licensee] to be allowed simultaneously to reap all the benefits of the licensing agreement and to deprive the licensor of all his royalties.")).

Just as important, however, Shell's apparent breach of its duty to notify under the agreement is itself more likely to frustrate federal patent policy than enforcement of the contract. As already noted, *Lear* focused on the "full and free use of ideas in the public domain." *Lear,* 395 U.S. at 674, 89 S.Ct. at 1913. By abrogating its notification duty, Shell delayed a timely challenge to the validity of the '698 patent and postponed the public's full and free use of the invention of the '698 patent. Shell enjoyed the protection of the license from 1987 until SGK became aware of the Seadrift Process. Upon SGK's discovery of its Seadrift process, Shell sud-

denly seeks the protection of the *Lear* policies it flaunted for many years. However, a licensee, such as Shell, cannot invoke the protection of the *Lear* doctrine until it (i) actually ceases payment of royalties, and (ii) provides notice to the licensor that the reason for ceasing payment of royalties is because it has deemed the relevant claims to be invalid. Other circuits addressing this issue have arrived at the same conclusion. *See, e.g., Rite–Nail Packaging Corp. v. Berryfast, Inc.,* 706 F.2d 933, 936–37 (9th Cir.1983); *Hull v. Brunswick Corp.,* 704 F.2d 1195, 1203 (10th Cir.1983); *American Sterilizer Co. v. Sybron Corp.,* 614 F.2d 890, 897–98 (3d Cir. 1980); *PPG Indus., Inc. v. Westwood Chem., Inc.,* 530 F.2d 700, 706, 708 (6th Cir.1976).

In this factual setting, therefore, enforcement of the license according to its terms, even if this entails a determination of whether the Seadrift process infringes a now-invalidated patent, does not frustrate federal patent policy. Accordingly, this court remands this case to the district court for enforcement of the license (prior to the date Shell first challenged the validity of the claims) and, if necessary, computation of back royalties.

## V.

In accordance with this opinion, this court affirms the district court holding that claims 1–6 and 14 are invalid under 35 U.S.C. § 102(b). This court, however, remands the case to the district court for proper consideration of infringement of claim 13, infringement by Shell's polybutylene operations, and infringement of the '698 patent by the Seadrift Process—including a determination of back royalties if necessary.

## COSTS

Each party shall bear its own costs.

*AFFIRMED–IN–PART, REVERSED–IN–PART, AND REMANDED.*