MEDIMMUNE, INC., Plaintiff,

v.

GENENTECH, INC., et al., Defendants.

No. CV 03–2567 MRP (CTx).

United States District Court,
C.D. California.

Feb. 7, 2008.

1002

Aaron P. Maurer, David C. Kiernan, Gerson A. Zweifach, Jessamyn S. Berniker, Paul B. Gaffney, Philip A. Sechler, Rebecca S. Legrand, Richard S. Scott, Williams and Connolly LLP, Washington, DC, Andrea Weiss Jeffries, Donald William Ward, Munger Tolles & Olson, Los Angeles, CA, Elliot M. Olstein, Carella Byrne Bain Gilfillan Cecchi Steward & Olstein, Roseland, NJ, for Plaintiff.

Bryan K. Anderson, Edward G. Poplawski, Paul D. Tripodi, II, Sandra S. Fujiyama, Sidley Austin Brown & Wood, David I. Gindler, Joseph M. Lipner, Laura W. Brill, Morgan Chu, William Joss Nichols, Richard E. Lyon, III, Irell and Manella LLP, Los Angeles, CA, Christopher S. Yates, Daniel M. Wall, Dean G. Dunlavey, J. Thomas Rosch, James Kevin Lynch, Mark A. Flagel, Robert J. Gunther, Jr., Latham & Watkins, Daralyn J. Durie, David J. Silbert, John W. Keker, Jon B. Streeter, Mark A. Lemley, Steven Arthur Hirsch, Keker & Van Nest, San Francisco, CA, Gordon A. Goldsmith, Duarte, CA, for Defendants.

ORDER (1) GRANTING DEFENDANTS' CROSS MOTION FOR PARTIAL DISMISSAL; (2) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S FOURTH CAUSE OF ACTION; (3) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S FIRST AND SECOND CAUSES OF ACTION; AND (4) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT FOR NON–INFRINGEMENT

MARIANA R. PFAELZER, District Judge.

Before the Court are Defendants' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S FIRST, SECOND, AND FOURTH CAUSES OF ACTION, Defendants' CROSS MOTION FOR PARTIAL DISMISSAL, and Plaintiff's MOTION FOR PARTIAL SUMMARY JUDGMENT OF NON-INFRINGEMENT. After consideration of the relevant arguments, for the reasons that follow, the Court grants Defendants' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S FOURTH CAUSE OF ACTION and its CROSS MOTION FOR PARTIAL DISMISSAL OF MEDIMMUNE'S CLAIMS. The Court denies Defendants' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S FIRST AND SECOND CAUSES OF ACTION and Plaintiff's MOTION FOR PARTIAL SUMMARY JUDGMENT OF NON-INFRINGEMENT.

## I. BACKGROUND

Plaintiff MedImmune is a biotechnology company that develops and produces antibody therapies. Defendants Genentech and City of Hope (collectively, "Genentech") are co-assignees of U.S. Patent No. 6,331,415 ("'415 patent" or "Cabilly II patent"). On June 4, 1997, MedImmune and Genentech entered into a license agreement whereby MedImmune agreed to pay royalties on products that would "if not

licensed under [that Agreement], infringe one or more claims of [the pending '415 patent], which have neither expired nor been declared invalid by a court or other body of competent jurisdiction from which no appeal has been or may be taken." Decl. Of W. Joss Nichols Supp. Defendants' Mot. For Summ. J., Ex. 3 ¶ 1.10.

After the patent issued on December 18, 2001, MedImmune paid royalties pursuant to this license agreement for its Synagis product, a monoclonal antibody approved for the prevention of serious lower respiratory disease. The payments were made under protest, and on August 13, 2003, MedImmune filed the instant complaint ("first amended complaint" or "FAC") in this Court, while continuing to pay royalties due under the agreement. The First Cause of Action in the FAC seeks declaratory judgment that MedImmune owes no royalty payments under the license agreement. The Second and Third Causes of Action seek declaratory judgment that the '415 Patent is invalid and unenforceable, respectively. The Fourth Cause of Action seeks declaratory judgment that the Synagis product does not infringe any valid and enforceable claim of the '415 Patent.

On April 26, 2004, the Court followed then-controlling *Gen–Probe, Inc. v. Vysis, Inc.*, 359 F.3d 1376 (Fed.Cir.2004), and granted Genentech's motion to dismiss MedImmune's First, Second, Third, and Fourth Causes of Action for lack of subject matter jurisdiction because MedImmune remained a licensee in "good standing" by continuing to pay royalties under the agreement. *Medimmune, Inc. v. Genentech, Inc. (MedImmune I)*, No. CV 03–2567 MRP, 2004 U.S. Dist. LEXIS 28680 (C.D.Cal. Apr. 26, 2004). The Federal Circuit affirmed in *Medimmune, Inc. v. Genentech, Inc. (Medimmune II)*, 427 F.3d 958, 961 (Fed.Cir.2005), and the Supreme Court granted certiorari. 546 U.S. 1169, 126 S.Ct. 1329, 164 L.Ed.2d 46 (2006). On January 9, 2007, the Supreme Court reversed the decision of the Federal Circuit, holding that the standard for subject matter jurisdiction is satisfied without MedImmune's *breach* of the license agreement. *See MedImmune, Inc. v. Genentech, Inc. (MedImmune III)*, —— U.S. ——, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007). The Supreme Court remanded to this Court to proceed with the case. *Id.*

Accordingly, the Court conducted a Markman hearing, and on August 16, 2007, issued a Claim Construction Order construing several terms in the '415 Patent. In an August 23, 2007 teleconference, MedImmune stipulated, in light of the Claim Construction Order, that its production of Synagis infringes Claim 33 of the patent (but for the license agreement). Plaintiff's Mot. For Partial Summ. J. Of Non–Infringement ("Pl.'s Mot.") at 5. MedImmune thereafter filed a Motion for Partial Summary Judgment of Non–Infringement on October 29, 2007, seeking a ruling from this Court that Synagis does not infringe any claim *other than* Claim 33. A month later, Genentech responded by filing an unconditional, irrevocable covenant not to sue or seek royalties (from MedImmune) with respect to Synagis on any Claim of the '415 Patent other than Claim 33 (the "covenant"). *See* Defendants' Covenant Re Synagis ["Covenant Not to Sue"], Decl. of David I. Gindler ["Gindler Decl."], Ex. A (promising never to assert "that any activities related to Synagis, whether occurring before or after the date of this covenant, infringe ... any claim of the [Cabilly II] patent except Claim 33 .... ").

On November 26, 2007, Genentech filed its Motion for Summary Judgment on Plaintiff's First, Second, and Fourth Causes of Action. Defendants' Mot. For Summ. J. On Pl. First, Second, and Fourth Causes of Action ("Defs.' Mot."). In brief,

Genentech contends that summary judgment is appropriate for MedImmune's First Cause of Action ("Contractual Rights and Obligations") because MedImmune's stipulation regarding Claim 33 establishes that it presently owes royalties under the terms of the contract. Genentech further argues that it is entitled to summary judgment on MedImmune's Second Cause of Action ("Patent Invalidity") because (1) there is no substantive cause of action for "patent invalidity" created by either patent law or the Declaratory Judgment Act; (2) the doctrine of "licensee estoppel" bars MedImmune's invalidity claim; and (3) the policies of the Declaratory Judgment Act and the equities in this case present a scenario where the Court should exercise its discretion to decline to hear invalidity. Finally, Genentech argues that MedImmune's admission regarding Claim 33 compels a finding of summary judgment for Genentech on MedImmune's Fourth Cause of Action ("Non–Infringement").

After filing its summary judgment motion, Genentech filed a CROSS MOTION FOR PARTIAL DISMISSAL OF MEDIMMUNE'S CLAIMS, which seeks to "confine this litigation to claim 33 of the '415 patent" because its covenant extinguishes the Court's subject matter jurisdiction over all claims of the '415 Patent except Claim 33. Defendants' Cross Mot. For Partial Dismissal of MedImmune's Claims ("Defs.' Cross Mot."), at 1.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (2007). In order for the nonmoving party to prevail, there must be evidence sufficient to allow a reasonable jury to return a verdict for the nonmoving

party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In this inquiry, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505.

## III. DISCUSSION

### A. Genentech's Cross Motion for Partial Dismissal of MedImmune's Claims

#### 1. Arguments

Genentech argues that the effect of the Covenant Not to Sue is unambiguous under Federal Circuit caselaw: it extinguishes subject matter jurisdiction as to all claims except for Claim 33. While MedImmune does not contest the basic framework provided by *Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340 (Fed. Cir.2007), and *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054 (Fed.Cir.1995), it argues that the covenant should not be given jurisdictional effect for two main reasons: because it was improperly brought, and because NuMax, the successor product to Synagis, supports retaining jurisdiction.

#### 2. Legal Standard

A claim for declaratory judgment may only be brought to resolve an "actual controversy". 28 U.S.C. § 2201. Thus, a party seeking to base jurisdiction on the Declaratory Judgment Act bears the burden of proving that the facts alleged, "under all the circumstances," demonstrate a "substantial" controversy of "sufficient immediacy" to warrant a declaratory judgment. *Benitec*, 495 F.3d at 1343 (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 S.Ct. 764, 771, 166 L.Ed.2d 604 (2007)). An actual controversy must exist through all stages of the litigation,

not only at the time the declaratory action is filed. *Arizonans for Official English v. Arizona,* 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997).

 Under Federal Circuit precedent, a properly executed covenant not to sue for infringement not only moots the controversy with respect to infringement, *see Highway Equip. Co., Inc., v. FECO, Ltd.,* 469 F.3d 1027, 1033 n. 1 (Fed.Cir. 2006), but it also eliminates subject matter jurisdiction with respect to remaining declaratory claims for patent invalidity and unenforceability.[1] *Super Sack,* 57 F.3d at 1058; *Benitec,* 495 F.3d at 1340 (upholding covenant to sue, despite repudiation of the old "reasonable apprehension of imminent suit" standard for declaratory judgment used by *Super Sack*). Such a covenant need not cover potentially infringing activities in the future as long as it covers the past and present activities that constitute the "actual controversy" between the parties. *Benitec,* 495 F.3d at 1345–48. However, the covenant must be made before the Court considers and decides the issue of infringement. *Compare Fort James Corp. v. Solo Cup Co.,* 412 F.3d 1340, 1348 (Fed.Cir.2005) (holding that covenant did not moot counterclaim for unenforceability where jury had already returned verdict of noninfringement) *with Benitec,* 495 F.3d at 1347 (holding promise not to sue extinguished jurisdiction because "no trial of the infringement issue has taken place," despite fact that patentee had already voluntarily withdrawn its infringement complaint at time of promise).

### 3. Analysis

#### a. Under Federal Circuit Precedent, the Covenant Not to Sue is Proper and Extinguishes Subject Matter as to the Counterclaims

MedImmune asserts that the timing and form of the Covenant Not to Sue are improper. First, it contends that the infringement issue in this case was already decided by this Court's *Markman* decision, and thus any covenant comes too late to have jurisdictional effect. It also suggests that a covenant only as to some, rather than as to all, the claims at issue, will neither shorten a trial nor narrow the evidence presented on invalidity and thus, under *Lear Auto. Dearborn Inc. v. Johnson Controls Inc.,* 528 F.Supp.2d 654 (E.D.Mich.2007) should similarly be deemed ineffective.

#### b. The Timing of the Covenant after the *Markman* Hearing Was Not Improper.

 Accusing Genentech of attempting to nullify this Court's *Markman* ruling, MedImmune argues that a covenant not to sue cannot affect jurisdiction "when it suddenly appears after significant issues have been ruled upon." Pl.'s Reply Supp. Mot. Partial Summ. J. Non–Infringement and Opp'n to Defs.' Cross–Mot. for Dismissal ["Pl.'s Opp'n to Covenant"] at 12. However, Federal Circuit precedent makes clear that the only significant ruling that can affect the validity of a covenant not to sue is an actual finding of noninfringement.

1. Though *Benitec* and other Federal Circuit cases do not make the distinction, a *partial* covenant not to sue may limit the scope of an invalidity counterclaim but not the scope of an unenforceability counterclaim. *See Biogen, Inc. v. Amgen, Inc.,* 913 F.Supp. 35, 38 (1996) (dismissing, under *Super Sack,* defendant's invalidity counterclaim as to claims on which the patentee promised never to sue; but allowing defendant to contest enforceabil-ity of entire patent). A determination that inequitable conduct has occurred renders the entire patent unenforceable, *see Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 867, 874 (1988). Indeed, courts will often have the ability to hear an unenforceability claim on a patent regardless of jurisdiction. *See Monsanto Co. v. Bayer Biosci. N.V.,* No.2007–1109 (Fed.Cir. Jan. 25, 2008) (slip op.) at *21–*24.

In *Fort James*, the case relied upon by MedImmune, the patentee offered a covenant not to sue after the jury returned a verdict finding the patent not infringed (and not invalid). 412 F.3d at 1345. The Federal Circuit held that, due to the "unique procedural posture of the instant case," the covenant did not extinguish subject matter jurisdiction over the defendant's unenforceability counterclaim. *Id.* at 1347. Likewise, in the subsequent *Benitec* decision, a covenant not to sue was given effect because no actual *ruling* of noninfringement had been reached. Realizing that it had no viable infringement claim against the defendant[2], the patentee in *Benitec* voluntarily dismissed its infringement claim, and in its appellate brief, entered into a covenant not to sue the defendant. *Id.* at 1343. Even though the dissent decried the patentee's "manipulative efforts to defeat declaratory jurisdiction," *id.* at 1351 (Dyk, J., dissenting), the *Benitec* majority distinguished *Fort James*, stating that "[t]he instant setting is different because no trial of the infringement issue has taken place." *Id.* at 1347.

Thus, even if MedImmune is correct that there is "virtually no precedent" for giving effect to a covenant tendered after a *Markman* hearing, the only factor that matters under the Federal Circuit's apparent bright line rule is whether a ruling on noninfringement has been reached. As long as there has been no such ruling, the Federal Circuit does not evaluate the merits of a case in deciding whether to give effect to a covenant not to sue. Significantly, in *Benitec*, the covenant not to sue extinguished subject matter jurisdiction over the invalidity and unenforceability counterclaims even where the issue of infringement was effectively decided by newly issued Supreme Court precedent.[3] Here, even if it were true that this Court's August, 2007 Claim Construction Order indicates that MedImmune would not infringe claims other than Claim 33, it is not an *actual* ruling of noninfringement. A different rule would require that the Court effectively decide the infringement issue as to all claims before giving effect to a covenant not to sue, and such an interpretation is not supported by Fort James or Benitec.

c. Even Under the Questionable Exception Fashioned in *Lear Auto*, A Partial Covenant Is Not Improper in this Case.

■ MedImmune also argues that Genentech's covenant does not act to extinguish subject matter jurisdiction because it covers only some, not all of the claims. Noting that most of the cases cited by Genentech, including *Super Sack, Fort James*, and *Benitec*, involve covenants that cover all the patent claims at issue, MedImmune suggests that a partial covenant not to sue presents different issues than a full covenant. In making this argument, MedImmune relies principally on *Lear Auto.*, 528 F.Supp.2d 654, to establish that a partial covenant not to sue, covering only a subset of the claims, should not be given effect where it is clear that the covenant was served "in order to evade ruling on a briefed summary judgment motion." Pl.'s Opp'n to Covenant at 13.

---

**2.** The patentee in *Benitec* admitted that it had no viable infringement claim against the defendant due to the outcome of a Supreme Court case that had been handed down during the proceedings. 495 F.3d at 1342–43 (noting that *Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193, 125 S.Ct. 2372,

162 L.Ed.2d 160 (2005) extended the pharmaceutical research exception in § 271(e)(1) to cover the defendant's activities).

**3.** *See Merck v. Integra*, 545 U.S. at 193, 125 S.Ct. 2372.

i. Despite Factual Similarities to this Case, the Reasoning of *Lear Auto* is Inapposite.

*Lear Auto.* fashions an exception to the *Super Sack* rule in the context of partial covenants. It surveys cases in which a patentee voluntarily *withdrew* some, but not all patent claims from contention and then attempted to limit the other party's invalidity counterclaim to only those patent claims that were still being asserted. *Id.* at 670–74. Courts in those cases allowed the scope of invalidity to be so limited only where the patentee had initially asserted *some, not all* of the claims in its patent. *Id.* The reasoning was that once a patentee has put its entire patent into play, it must face an invalidity challenge as to all of the patent claims even if it later withdraws some of them. *Id.* (citing principle established in *Jervis B. Webb Co. v. Southern Systems Inc.* 742 F.2d 1388, 1399 & n. 8 (Fed.Cir.1984)). Analogizing from these "withdrawal" cases, *Lear Auto.* states that the effectiveness of a partial covenant not to sue should likewise turn on whether the patentee initially asserted all claims of the patent or whether the patentee asserted only a *subset* of claims. *Id.* at 673–74. There is, however, no justifiable rationale for extending this rule to the context of a covenant not to sue, nor does MedImmune suggest one. As the following subsection makes clear, the policy and fairness concerns underlying covenants not to sue do not turn on whether or not a plaintiff initially asserted all or only some claims.

Without discussing the reasoning animating that case, MedImmune cites *Lear Auto.* primarily because its facts and holding compare favorably to the situation here. In *Lear Auto.*, the patentee tendered a partial covenant not to sue after the defendant brought a motion for summary judgment of noninfringement and the motion had been fully briefed by the parties. *Id.* at 656–57. The court refused to give the covenant jurisdictional effect. *Id.* Yet the narrow holding of *Lear Auto.* itself was based solely on the questionable exception it fashioned from the *Super Sack* rule: the *Lear Auto.* patentee had *initially* asserted *all* its claims, rather than a subset thereof, and thus would not be permitted to limit the invalidity challenge only the claims asserted after its covenant not to sue. Here, however, Genentech initially asserted only a subset of the claims of the '415 Patent and thus would not fall under the exception in *Lear Auto.* Even if this Court chose to follow *Lear Auto.*, it could not grant relief on that basis. Regardless of the policy arguments involved, MedImmune has provided the Court with no means by which to disregard Genentech's partial covenant.

ii. MedImmune's Practicalities and Fairness Objections Are Not Part of the Federal Circuit's Fairness Inquiry.

MedImmune also objects to this partial covenant not to sue on fairness grounds, echoing in this respect the strong language in *Lear Auto. See id.* at 670–71 (expressing serious reservations about "this 'bursting bubble' theory of subject matter jurisdiction, under which a party's unilateral withdrawal of a claim of infringement at ***any time*** before judgment is entered" divests the court of jurisdiction over both the infringement claim and the counterclaim) (emphasis in original); *id.* at 674–75 ("it is difficult to view Lear's tactics in this case as anything other an eleventh-hour attempt to pull the jurisdictional rug out from under a [invalidity] counterclaim that it could not defend against on the merits"). However, the policy concerns raised by *Lear Auto.* are clearly relevant to all covenants not to sue, not just to partial covenants (and not just to partial covenants that are offered in cases in which the patentee initially asserted all

claims.) A covenant not to sue is intended precisely to moot the issue of infringement and limit the scope of an invalidity counterclaim. Yet covenants not to sue are unquestionably valid, *see Benitec*, 495 F.3d at 1340, and the Federal Circuit, despite recognizing the potential for abuse, appears to have made the policy judgment that such covenants are desirable and should be encouraged. *See, e.g., Fort James*, 412 F.3d at 1354–55 (Schall, J., dissenting) ("I acknowledge that it may seem unfair to allow a patentee to first proceed with its infringement claim and then, if the result is not favorable, eliminate the court's jurisdiction over the accused infringer's counterclaim by covenanting not to sue the accused infringer. Fairness is not part of the jurisdictional inquiry, however.") (suggesting that covenants not to sue should be given effect even after a final judgment of noninfringement). The Federal Circuit has not suggested that a different rule should apply where partial covenants are involved.

MedImmune objects further regarding the practical consequences of partial covenants: that even if they are subject to the same evils as covenants that cover the entire case, they provide none of the corresponding benefits. It contends that a partial covenant here will neither spare this Court a need for a trial on invalidity nor dispose of the issue of infringement (which will go forward on Claim 33). Additionally, MedImmune asserts that many of its arguments for patent invalidity, such as double patenting, will require the same kind proof whether or not the scope of the invalidity claim is limited to Claim 33. Thus, in its view, the partial covenant may in fact neither shorten the trial nor narrow the evidence. Genentech, in contrast, portrays the covenant as a "tool to streamline the case so that it rises or falls on a single set of issues revolving solely around claim 33." Defs.' Reply Supp. Cross–Mot. for Partial Dismissal of MedImmune's Claims ["Defs.' Reply Supp. Covenant"] at 15. It is possible that both assessments are correct, to some extent. But regardless of which view of the case is more accurate, Federal Circuit law remains clear as to the effect of Genentech's unilateral covenant: the invalidity claim can be heard only as to Claim 33.

d. MedImmune May Not Rely on NuMax to Support Subject Matter Jurisdiction Because NuMax is Not at Issue in this Suit.

■■■ MedImmune's second principal objection to the Covenant Not to Sue is that it specifically excludes another MedImmune product, called NuMax. MedImmune characterizes NuMax as "the next generation of Synagis" and "functionally identical" to Synagis for purposes of the Cabilly II Patent. Pl.'s Opp'n to Covenant at 4–5; *see also* Covenant Not to Sue at A–7 (expressly stating that covenant "does not include motavizumab," the medical name for NuMax). As of the time it submitted its Opposition, MedImmune had not filed the required Biologics License Application (BLA) with the Food & Drug Administration (FDA). Pl.'s Opp'n to Covenant at 5. Regardless, it states that NuMax has completed its clinical trials, that MedImmune has produced "commercial" quantities of NuMax, and that it "expects the product to be approved for sale [by the FDA] within ten months." *Id.* Permitting the Covenant to take effect despite its exclusion of NuMax, argues MedImmune, would force it to relitigate the exact same claim construction and infringement issues again in the near future.

■■■ MedImmune contends that "when a new product is sufficiently 'immediate and realistic,' and is not covered by the tendered covenant, the dispute between the patentee and the manufacturer provides subject matter jurisdiction." Pl.'s

Opp'n to Covenant at 18. MedImmune correctly states the rule that a covenant not to sue must extinguish the entire "actual controversy" between the parties. *See* 28 U.S.C. § 2201; *see also Benitec,* 495 F.3d at 1340 (reaffirming the *Super Sack* rule under the newly modified standard for declaratory judgment). However, its citation to *Cardinal Chem. Co. v. Morton Int'l, Inc.,* 508 U.S. 83, 98, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993), is inapposite. Despite the "importance to the public at large of resolving questions of patent validity," the Federal Circuit has consistently interpreted the holding of *Cardinal Chemical* as limited solely to the appellate jurisdiction of the Federal Circuit to vacate a judgment of invalidity. *See Super Sack,* 57 F.3d at 1060 (characterizing *Cardinal Chemical* as a "relatively narrow" decision that ended the Federal Circuit's routine practice of vacating declaratory judgments of invalidity where noninfringement had already been found).[4]

The Plaintiff has not demonstrated that NuMax is in fact part of the actual controversy in this case. Indeed, MedImmune has always directed its pleadings exclusively to Synagis, *see* First Amended Complaint ¶ 132, and has never amended its pleading to reference NuMax. Furthermore, Genentech states that MedImmune until very recently has refused to provide any discovery related to NuMax. *See* Defs.' Reply Supp. Covenant at 6–8; Richard E. Lyon Decl. Supp. Defs.' Cross–Mot. for Partial Dismissal of MedImmune's Claims, Ex. D at 44 (detailing MedImmune's September 10, 2007 objection to Genentech's Third Set of Requests for Production that MedImmune's pipeline products, including NuMax, are "not at issue in this case"). In fact, this Court was not informed about the existence of NuMax until November 30, 2007, when it asked MedImmune a direct question about its product pipeline during a conference call. *See* 11/30/2007 Conference Call Transcript at 9:10–9:25, 10:1–10:2, 10:14–10:24 (statement by Mr. Zweifach, not identifying NuMax by name, but suggesting an early 2009 product release date). It would be inconsistent at this stage to find subject matter jurisdiction based upon a product which MedImmune, until very recently, refused to even discuss in connection with this litigation.[5]

Therefore, because MedImmune has consistently maintained that NuMax is not part of this suit, it is irrelevant whether or

4. The Court recognizes that the Federal Circuit's jurisprudence regarding covenants not to sue exposes some tension with *Cardinal Chemical.* A case or controversy adequate to support a declaratory judgment counterclaim for invalidity exists where a court enters a *ruling* of noninfringement, *see Fort James,* 412 F.3d at 1348 (counterclaim for invalidity or enforceability "raises issues beyond the initial claim for infringement that are not disposed of by a decision of noninfringement") (citing *Cardinal Chem.,* 508 U.S. at 96, 113 S.Ct. 1967; *Altvater v. Freeman,* 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450 (1943)), and it may seem strange to reach a different result where the patentee chooses to file a covenant not to sue, prior to a final judgment of noninfringement, that similarly ensures that the defendant will not be held liable for infringement. However, the Federal Circuit rebutted this

objection in *Super Sack* itself. 57 F.3d at 1060.

5. Compounding the problems with MedImmune's NuMax theory is the uncertainty related to FDA approval. *See generally Telectronics Pacing Sys., Inc. v. Ventritex, Inc.,* 982 F.2d 1520, 1527 (Fed.Cir.1992) (no subject matter jurisdiction where potentially medical infringing device had just begun clinical trials and was years away from FDA approval). In this case, MedImmune had completed clinical trials for NuMax, but had not yet filed its Biologics License Application with the FDA at the time of its Opposition. MedImmune expects FDA approval within ten months; but even if the Court takes MedImmune's word as to the timetable of the regulatory process, the trial in this case, set for June 2008, will have long since concluded.

not NuMax is "functionally identical" to Synagis for purposes of the '415 Patent. Furthermore, it is irrelevant whether Numax is in "a sufficiently advanced stage that, but for the license, Genentech could file an infringement suit," Pl.'s Opp'n to Covenant at 19. Any such suit brought by Genentech (or perhaps by MedImmune) would be specifically about Numax, while MedImmune itself has made clear time and again that the instant suit solely concerns Synagis. At this juncture, the Court declines to analyze whether NuMax, which was five years away from market at the time MedImmune filed its complaint and could not have given rise to subject matter jurisdiction at that time, can today supply subject matter jurisdiction comprising the actual controversy between the parties. MedImmune, by its course of action throughout this litigation, has already decided the issue.

**B. Genentech's Motion for Summary Judgment On MedImmune's First Cause of Action ("Contractual Rights and Obligations")**

**1. Arguments**

Genentech argues that MedImmune's admission that Synagis practices Claim 33 of the '415 Patent mandates summary judgment on MedImmune's First Cause of Action. Relying on contract language that requires royalties on "licensed products" until the patent has been "held invalid by a final judgment from which no further appeal may be taken,"[6] Genentech argues that no contract issue remains unresolved in this case. Defs.' Mot. at 12. Because MedImmune admits that Synagis is a "licensed product" that would, but for the

agreement, infringe the '415 Patent, and because the patent has not been held invalid in a final, unappealable judgment, the Court should rule that MedImmune is obliged to pay royalties. *Id.*

MedImmune responds that it has not "admitted" any obligation to pay royalties, notwithstanding its admission regarding Claim 33. Plaintiff's Resp. to Defs' Mot. Summ. J. ("Pl.'s Resp.") at 3. Its argument stems principally from case law—including *Lear v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), and *MedImmune III*—that suggests that federal policy considerations free MedImmune from its contractual obligation to pay royalties if the relevant claims of the '415 patent are invalidated.[7] *Id.* at 1–2. Central to this assertion is the similarity between the contract here and the contract clause at issue in *Lear. Id.* at 1; Jan. 14 Hearing Tr. at 14:16–14:19.

**2. Analysis**

a. MedImmune's Ongoing Contractual Obligations are Tied to Patent Validity Whether or Not the License is Enforced as Drafted.

Genentech's motion brings to the forefront the possible effects of an invalidity judgment on MedImmune's royalty obligations under the license. A finding of patent invalidity in this case may lead to one of several outcomes: if the contract is enforced as drafted, MedImmune must continue to pay royalties until a final, unappealable judgment. Alternatively, if MedImmune is correct and the federal policy considerations embodied in *Lear* prevail, it is free of its royalty obligations as

---

6. This contractual requirement of a "final judgment from which no further appeal may be taken" is hereafter identified as a "final, unappealable judgment."

7. At oral argument, MedImmune stated that it may seek restitution if the patent is invalidated, but emphasized that "the highlight if [its] claim is that [it does not] owe any money *going forward.*" *See* Jan. 14 Hearing Tr. 52:16–52:17 (emphasis added).

soon as the relevant claims of the patent have been found invalid; and it may further be entitled to restitution for royalties paid back to the date it filed suit.

The Supreme Court declined to instruct which outcome is appropriate, explaining only that MedImmune's contention that it owed no royalties on an invalid patent was not frivolous, and accordingly, MedImmune had sufficiently *alleged* a contractual dispute. *See* 127 S.Ct. at 769–770. This Court likewise declines, at this juncture, to determine the consequences of an invalidity judgment on MedImmune's obligations under the contract. There are two reasons why it is proper to do so. First, any decision now on the effects of patent invalidity on this contract would necessarily be advisory because the patent has not been invalidated. Second, and more importantly, an invalidity determination would impact MedImmune's obligations under the contract *no matter which route* the Court may ultimately take once that determination is made. Clearly, if MedImmune is correct that *Lear* and its progeny immediately relieve it of its royalty obligations, then Genentech's Motion must be denied. But even if Genentech is correct, and the terms of the contract control, MedImmune's ongoing contractual obligations are tied to validity because the contract frees MedImmune from royalty payments upon a final, unappealable judgment of invalidity. In other words, should this Court deem the relevant claims of the '415 Pat-

ent invalid, and that judgment be upheld upon appeal, MedImmune is no longer obliged to pay royalties under the express terms of the contract.

Thus, while the contract language may be unambiguous,[8] Genentech's contention that the contract does not "make validity an issue" is simply inaccurate. Jan. 14 Hearing Tr. at 13:11–13:12. This scenario is not analogous to one where MedImmune would merely "like to know whether the patent is invalid," *id.* at 13:15–13–16. To the contrary, underlying the instant dispute between the parties is a license agreement that directly implicates the validity of the patent. Thus, unlike potential customers, who might like to know whether the patent is invalid simply because they would receive a better price for Synagis as a result, *id.* at 13:18–13:24, the validity of the Cabilly II patent is relevant to MedImmune's obligations under the contract, regardless of whether the "final unappealable judgment" clause is enforced.

One need only compare the contract here to the scenario in which the license is contingent on validity but contains no clause requiring a final, unappealable judgment. Absent that requirement, a finding of invalidity by this Court would immediately free MedImmune from royalties.[9] The contract here should not be treated any differently just because MedImmune's release from royalty obligations is one step removed. Otherwise, for this Court to hold as Genentech urges[10] would permit a

---

8. The Court assumes, for purposes of this section, that Genentech is correct that the terms are unambiguous. It does not foreclose any future argument concerning ambiguity in any terms of the contract.

9. For example, Genentech explained at oral argument that the MedImmune's obligations "did depend on whether or not the patents were *infringed*." Jan. 14 Hearing Tr. at 3:6–3:7 (emphasis added). Absent the "final, unappealable judgment" condition, MedImmune's immediate contractual obligations

would similarly depend on whether or not the patents are *invalid*.

10. Genentech asserts not only that there is no contract dispute, but furthermore that the validity challenge cannot stand in the absence of a contract dispute. The Court does not opine on the latter issue. Regardless, to accept Genentech's argument would deny MedImmune a chance to invalidate the patent because the contract requires a final, unappealable judgment of invalidity.

licensor to effectively bar validity challenges simply by adding that clause, a result that appears inconsistent with *Lear*. *Panther Pumps & Equipment Co. v. Hydrocraft, Inc.*, 468 F.2d 225 (7th Cir.1972) (holding clause in a license agreement that directly prohibited challenge to patent validity unenforceable in light of *Lear*). The more appropriate result is to recognize, as the Supreme Court did in *MedImmune III*,[11] the similarity between the contract at issue here and one without that clause— and thus observe that MedImmune's ongoing contractual obligations are directly tied to the validity of the relevant claims of the '415 Patent.

In sum, an invalidity judgment impacts MedImmune's "Contractual Rights and Obligations" under the contract whether or not MedImmune is correct that *Lear* affects those rights and obligations, and regardless of its infringement admission. Accordingly, the Court denies Genentech's MOTION FOR SUMMARY JUDGMENT ON MEDIMMUNE'S FIRST CAUSE OF ACTION.

## C. Genentech's Motion for Summary Judgment On MedImmune's Second Cause of Action ("Patent Invalidity")

### 1. Arguments

In support of its summary judgment motion on MedImmune's assertion that the '415 Patent is invalid, Genentech argues that (1) there is no separate substantive cause of action for invalidity; (2) the Court should decline to exercise its discretionary jurisdiction over MedImmune's claim; and (3) licensee estoppel bars MedImmune's invalidity challenge.

The Court declines to address the first argument because, as discussed in Section III.B, *supra*, a contractual dispute remains that puts validity at issue. Accordingly,

this is not merely a case where "MedImmune wants a declaration about what its legal rights *outside* the contract would be," Defs.' Mot. at 16, and therefore it is not necessary to decide whether any such rights exist.

The Court also rejects Genentech's invitation to dismiss the declaratory Second Cause of Action on discretionary grounds.

Genentech's licensee estoppel argument merits additional discussion. Genentech asserts that licensee estoppel bars MedImmune's patent invalidity claim because MedImmune has not repudiated the contract. It argues that the 1969 Supreme Court decision in *Lear v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), which "resolved the issue of licensee estoppel by writing its obituary," *Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220, 1223 (Fed.Cir.1988), should be distinguished on the grounds that MedImmune is a *nonrepudiating* licensee. Genentech buttresses this argument by explaining that recent courts, including the Federal Circuit, have declined to extend *Lear*. Moreover, it notes that the Federal Circuit in *Studiengesellschaft Kohle v. Shell Oil Co.*, 112 F.3d 1561 (Fed.Cir.1997) ("*Kohle*"), expressly imposes a repudiation requirement on the invocation of *Lear*. Because that requirement has not been met, Genentech reasons, MedImmune is estopped from challenging patent validity, and therefore Genentech is entitled to summary judgment on MedImmune's Second Cause of Action.

MedImmune's response is multifold. First, on the doctrinal point, MedImmune argues that *Lear does* apply because its fundamental holding was broad enough to cover nonrepudiating licensees, and *Kohle* is inapplicable because of the narrow ques-

---

**11.** The Supreme Court clearly analogizes the clause here to that in *Lear*, which did not

require a "final, unappealable judgment." *See* 127 S.Ct. at 769–770.

tion in front of the Federal Circuit in that case. Second, citing the Supreme Court's opinion in *MedImmune III*, MedImmune contends that licensee estoppel could not bar its challenge to the patent because the license itself expresses no such bar. MedImmune asserts that no promise to refrain from seeking patent invalidity exists, nor can one be implied by the mere payment of royalties, particularly because at the time of contracting Genentech was well aware that MedImmune could seek to invalidate the patent.

## 2. Legal Standard

### a. *Lear v. Adkins*

An appropriate starting point for consideration of Genentech's argument is the 1969 Supreme Court decision in *Lear*, which remains the Supreme Court's definitive statement on the licensee estoppel doctrine. In that case, the Lear Corporation and inventor John Adkins entered into a license agreement in 1955 providing that Lear would pay royalties for an Adkins invention but retain the right to terminate the agreement should the PTO refuse to issue or invalidate a patent on the invention. 395 U.S. at 657, 89 S.Ct. 1902. Adkins prosecuted his patent application in front of the PTO, and the patent was granted in 1960 after substantial narrowing of patent scope in two amendments. *Id.* at 658, 89 S.Ct. 1902. During the delay between 1955 and 1960, Lear became convinced that the PTO would never grant the patent and that it should not have to continue paying royalties. *Id.* Indeed, in 1957, Lear found prior art that it believed fully anticipated Adkin's invention and stopped paying Adkins royalties due under the license agreement. *Id.* Once the patent issued in 1960, Adkins immediately sued Lear for breach of the 1955 contract in California state court. *Id.* at 660, 89 S.Ct. 1902. The trial court judge directed a verdict for Adkins for unpaid royalties

due under the agreement, and in doing so, held that Lear was estopped from questioning the validity of the patent due to the license agreement. *Id.* The decision was ultimately affirmed by the California Supreme Court, and proceeded to the United States Supreme Court. *Id.* at 661, 89 S.Ct. 1902.

The Court began with an examination of licensee estoppel and assignee estoppel case law, and concluded that "the estoppel doctrine had been so eroded that it could no longer be considered the 'general rule,' but was only to be invoked in an ever-narrowing set of circumstances." *Id.* at 664, 89 S.Ct. 1902. The Court then decided the case primarily based on the force of its public policy rationale. It viewed the difficulty courts had with licensee estoppel as "a product of judicial efforts to accommodate the competing demands of the common law of contracts and the federal law of patents": on the one hand, a purchaser cannot repudiate a contract simply because he becomes dissatisfied with the bargain; on the other hand, ideas must be dedicated to the common good if not protected by a valid patent. *Id.* at 668, 89 S.Ct. 1902. The Court found that the latter interest outweighed the former for two reasons. *Id.* at 670–71, 89 S.Ct. 1902. First, it did "not seem unfair" to require a patentee to defend the PTO's patent grant, especially since he has the presumption of validity on his side. *Id.* at 670, 89 S.Ct. 1902. Second, the "important public interest in permitting full and free competition in ideas which are in reality a part of the public domain" is a strong one that trumps the "technical requirements" of contract doctrine; this is particularly true in the case of licensees, because they may be the "only individuals with enough economic incentive to challenge" the patent's validity. *Id.* Thus, the Court declined to apply the licensee estoppel doctrine, and remanded to permit Lear to challenge the validity of

the patent. The Court also held that Lear was not required to comply with its contract and pay royalties "until such time as the patent ... is held invalid," and rather, if the patent was held invalid, Lear was free from any royalty obligation after the 1960 issuance date. *Id.* at 674, 89 S.Ct. 1902.

b. *Lear* Analysis Prior to the Federal Circuit

Prior to the establishment of the Federal Circuit, a number of courts that considered licensee estoppel after *Lear* readily relied on the *Lear* policy *rationale*, rather than its specific holding, to permit licensees to challenge patent validity. *See, e.g., Massillon–Cleveland–Akron Sign Co., v. Golden State Advertising Co.,* 444 F.2d 425, 425 (9th Cir.1971) ("We think the *rationale* of *Lear* requires us to hold that the covenant of Golden State ... in the settlement agreement ... not to contest the validity of MCA's patent, is void on its face and unenforceable") (emphasis added); *Panther Pumps & Equipment Co. v. Hydrocraft, Inc.,* 468 F.2d 225, 231 (7th Cir.1972) ("no contest" clause in a license agreement is unenforceable in view of *Lear*); *Atlas Chemical Industries, Inc. v. Moraine Products,* 509 F.2d 1, 5 (6th Cir. 1974) ("The present suit is an action by a licensee, Atlas, attacking the validity of a patent owned by the licensor, Moraine. The instant case is the type of suit authorized by *Lear* ...."); *Beckman Instruments, Inc. v. Technical Development Corp.,* 433 F.2d 55 (7th Cir.1970) (holding that *Lear* protects licensee's right to challenge patent validity even if the license is exclusive); *American Sterilizer Co. v. Sybron Corp.,* 526 F.2d 542 (3rd Cir.1975) (deciding that the policy underpinning the *Lear* decision controlled, and a declaratory plaintiff could not be barred from asserting invalidity); *Timely Products, Inc., v. Costanzo,* 465 F.Supp. 91, 95–96 (D.Conn. 1979) (license agreement that provides for royalty payments regardless of validity is unenforceable under *Lear* because *Lear* "holds not only that a licensee must always be permitted to challenge the validity of a patent but that he must also be free of any legal obstacles that remove all incentive to mount such an attack"). These cases, if nothing else, indicate that courts applied the policy rationale behind *Lear* to other factual scenarios where patent invalidity was raised in an agreement between licensor and licensee.

c. *Lear's* Treatment in the Federal Circuit

Early in its history, the Federal Circuit also cited with approval the policies behind *Lear*. *See, e.g., C.R. Bard, Inc. v. Schwartz,* 716 F.2d 874, 880 (Fed.Cir.1983) (explaining that *Lear* "changed the prior law ... on the basis of public policy" and "a licensee to a patent license agreement may not be estopped from asserting that the patent subject to the license is invalid"); *Cordis Corp. v. Medtronic, Inc.,* 780 F.2d 991, 995 (Fed.Cir.1985).

More recently, however, the Federal Circuit has distinguished *Lear* in several instances. For example, both MedImmune and Genentech support their arguments with the Federal Circuit's 1998 decision in *Diamond Scientific Co. v. Ambico, Inc.,* 848 F.2d 1220. In that case, the Federal Circuit distinguished *assignor-estoppel*—i.e. estoppel that bars the party who had sold his rights in the patent from later challenging its validity when he is sued by the assignee—from licensee estoppel because "the public policy favoring allowing a licensee to contest the validity of the patent is not present in the assignment situation." *Id.* at 1224. Its assignee-estoppel policy distinction aside, the Federal Circuit observed that the *Lear* holding "resolved the issue of licensee estoppel by writing its obituary." *Id.* at 1223. Thus,

*Diamond Scientific* does not provide much clear authority to either MedImmune's or Genentech's position in this case: On the one hand, the Federal Circuit used strong language in describing the end of *licensee* estoppel under *Lear*, but on the other the Federal Circuit declined to apply *Lear* to *assignor* estoppel. Other Federal Circuit decisions similarly distinguish *Lear* based on different policy concerns absent in the *Lear* case. *See, e.g., Hemstreet v. Spiegel, Inc.*, 851 F.2d 348, 350 (Fed.Cir.1988) (holding that a party must pay royalties under a settlement license agreement even though the patent was held unenforceable in another court because "[t]he enforcement of settlement of litigation involves another public policy totally absent in *Lear*: the encouragement of settlement of litigation and the need to enforce such settlements in order to encourage the parties to enter into them"); *Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 476 (Fed.Cir.1991) (holding that *Lear* does not control where a party enters into a consent decree not to challenge patent validity because "the Supreme Court in *Lear* did not consider the policy concerns evoked when preserving the finality of a judgment"); *Flex–Foot, Inc. v. CRP, Inc.* 238 F.3d 1362 (Fed.Cir. 2001) (holding that *Lear* is inapplicable where a party voluntarily elects to dismiss litigation with prejudice under a settlement agreement containing a clear and unambiguous statement not to challenge validity of the patent in suit).

Perhaps these Federal Circuit cases reflect the sentiment, expressed in the 1997 *Kohle* decision, that *Lear* reflects "tones that echo from a past era of skepticism over intellectual property principles." 112 F.3d at 1567. In the relevant facts of *Kohle*, Plaintiff and patent-holder "SGK" and Defendant Shell entered into a license agreement whereby Shell was licensed to use a patented process for the production of propylene in exchange for royalty payments that varied depending on the amount of production. *Id.* at 1563. As part of the agreement, Shell was obligated to account for its *entire* propylene production, including production that Shell believed fell outside the scope of the license agreement. *Id.* Starting in 1987, Shell failed to pay royalties on, and failed to account for, propylene that it produced using a new process. *Id.* Eventually, SGK terminated the license agreement and sued for unpaid royalties from 1987 to 1993, and infringement from 1993–1995. *Id.* The district court ultimately found the relevant claims of the patent to be invalid, freeing Shell from the infringement charge, but the question remained whether Shell could be held liable for *back*-royalties that it had not paid on the new process during the 1987–1993 period, if that process was deemed to be infringing. *See id.* at 1566–67.

In addressing this question, the Federal Circuit first explained that it was clear that Shell had breached its license agreement, in part because the agreement did not make royalties contingent on validity. *Id.* at 1567. But because a patent licensing agreement was at stake, the court examined the contract "for rare, but potential conflicts between state contract law and federal patent law." *Id.* Citing *Lear*, the Federal Circuit assessed whether "overriding federal policies would be significantly frustrated" by enforcing the license. *Id.* The court found no such overriding policies, and instead analogized to *Diamond Scientific* for two reasons:

First, Shell "executed a contractual agreement which produced significant benefits for the corporation and attested to the worth of the patent." *Id.* at 1568. Shell had the benefits of producing the product insulated from unlicensed competition, insulated from investigations of infringement, and insulated from royalties. *Id.* The court deemed it an "injustice" to

allow Shell to exploit the protection of the contract and patent rights and the later to abandon conveniently its obligations under those same rights. *Id.*

Second, and "just as important," Shell's failure to notify SGK under the agreement was likely to *frustrate federal patent policy* because it delayed a *timely* challenge to the validity of the patent. *Id.* Only upon suit by SGK did Shell assert patent invalidity and seek protection by invoking *Lear.* *Id.* Recognizing the unfairness that arises where the licensee "suddenly seeks the protection of the *Lear* policies it flaunted for many years," the Federal Circuit formulated a rule that a licensee cannot invoke the *Lear* doctrine until it (1) ceases payment of royalties and (2) provides notice to the licensor that the reason for ceasing payment of royalties is because it has deemed the relevant claims to be invalid. *Id.* Accordingly, the court remanded the case to the district court for enforcement of the license prior to the date that Shell first challenged the validity of the license.

#### d. *MedImmune III*

The Supreme Court provided little doctrinal guidance on this issue in its 2007 opinion. It stated only that *Lear* certainly applied to *repudiating* licensees, but "expressed no opinion on whether a nonrepudiating licensee is similarly relieved of its contract obligation during a successful challenge to a patent's validity—that is, on the applicability of licensee estoppel under these circumstances." [12] 127 S.Ct. at 769–70. The Court cited the two-prong rule provided by the Federal Circuit in *Kohle* but did not address whether that rule was consistent with *Lear,* or whether that rule was inapplicable to the present scenario. *Id.*

Setting the controversy over *Lear* and its progeny aside, the Court did opine on the application of licensee estoppel doctrine under these circumstances. Genentech argued that the license agreement was like an "insurance policy" against an infringement suit, and by continuing to operate under the agreement and suing for declaratory judgment, MedImmune "altered" the deal. *Id.* at 775–76. The Supreme Court expressed skepticism about this argument, stating that "the point seems to us mistaken" because "[p]romising to pay royalties on patents that have not been held invalid does not amount to a promise *not to seek* a holding of their invalidity." *Id.* at 776. In other words, a prohibition from seeking invalidity can "hardly be implied from the mere promise to pay royalties on patents." *Id.* Thus, "it is hard to see how the common-law rule has any application here" because "[p]etitioner is not repudiating or impugning the contract while continuing to reap its benefits" and instead is "asserting that the contract, properly interpreted, does not prevent it from challenging the patents, and does not require the payment of royalties because the patents do not cover its products and are invalid." *Id.*

### 3. Analysis

#### a. *Kohle* Does Not Prohibit MedImmune's Invocation of *Lear* Because It Dealt With a Significantly Different Factual Scenario.

 The language of *Kohle* appears to bar MedImmune's invocation of *Lear* because it has not "cease[d] payment of royalties" as required by first prong of the *Kohle* rule. *Kohle,* 112 F.3d at 1568. However, as MedImmune correctly asserts, that language taken out of context

**12.** At oral argument, MedImmune cited the "successful challenge to a patent's validity" language in the Supreme Court's decision as implying that a licensee could challenge validity—and only the relief from the contract obligation under *Lear* was left undetermined.

extends the holding far beyond the rest of the case. The holding concerned whether Shell could be held liable for past-due royalties where patent was later held invalid, in light of the fact that Shell had delayed adjudication of invalidity by clandestinely continuing to operate under the agreement. It bears mention that the Federal Circuit's two prong rule in *Kohle* is entirely consistent with the factual history in that case: without ceasing payment of royalties and notifying SGK, the suit would not be brought because Shell appeared inclined to continue under the agreement.

There are two key distinctions here that render the reasoning underlying the *Kohle* rule inapposite. First, MedImmune affirmatively seeks declaratory judgment that the patent is invalid, whereas in *Kohle* Shell raised patent invalidity as a defense. The Federal Circuit explained that "Shell's apparent breach of its duty to notify under the agreement is itself more likely to frustrate federal patent policy than enforcement of the contract" because "[b]y abrogating its notification duty, Shell *delayed a timely challenge* to the validity of the patent" (emphasis added). Fundamentally, Shell's abrogation was at odds with the federal policy that justified the *Lear* decision. In this case, MedImmune did not abrogate its notification duty; to the contrary it paid its royalties "under protest" and effectively notified Genentech when it filed suit. Indeed, it would "frustrate federal patent policy," as embodied by *Lear*, to prohibit MedImmune from asserting invalidity.

The importance of the distinction is reflected in later cases that describe *Kohle* as concerning the licensee's failure to challenge patent validity. For example, the Federal Circuit described its *Kohle* decision in *Go Medical Industries Pty, Ltd. v. Inmed Corp.*, 471 F.3d 1264, 1272–73 (Fed. Cir.2006) as "clarify[ing] that the *Lear* doctrine does not prevent a patentee from recovering royalties until the date the licensee first *challenges* the validity of the patent" (emphasis added). *See also Pony Pal, LLC v. Claire's Boutiques, Inc.*, No. 05 Civ. 2355, 2006 WL 846354, 2006 U.S. Dist. LEXIS 14962 (S.D.N.Y. Mar. 31, 2006) (stating that "Federal Circuit's rationale in [*Kohle*] was that a licensee who *fails to challenge* the validity of a patent benefits by retaining the protection of the license while depriving the public of the full and free use of the patented product by withholding a successful challenge to validity") (emphasis added); *Levenger Co. v. Feldman*, No. 06–81054, 2007 WL 2209255, *2–3, 2007 U.S. Dist. LEXIS 54917 at *7–8 (S.D.Fla. July 30, 2007) (refusing to apply the "rationale" of *Kohle* to a case with a different procedural posture).

In sum, as in *Kohle*, MedImmune continues to benefit in some ways by retaining the protection of the license. But unlike in *Kohle*, MedImmune is not "depriving the public of the full and free use of the patented product by withholding a successful challenge to validity." *Pony Pal*, 2006 WL 846354, at *3, 2006 U.S. Dist. LEXIS 14962 at *8. A party can "challenge" the validity of a patent by ceasing payment of royalties and notifying the licensor of its beliefs, *or* by affirmatively seeking declaratory judgment that the patent is invalid, as MedImmune has done here.

The second distinction is simply that, at this juncture, royalties due under the license in the past are not at issue here. The *Kohle* case and other courts that have applied its rule relate to situations where past-due royalties are at stake. *See, e.g., Revson v. Claire's Stores, Inc.*, 120 F.Supp.2d 322, 326–27 (S.D.N.Y.2000) (applying licensee estoppel because "the consequence of *Kohle* is that Boutiques' assertion of invalidity is no defense to plaintiff's claim for royalties due in respect of sales made prior to the filing of the complaint");

*Advanced Card Techs., LLC v. Versatile Card Tech., Inc.,* 410 F.Supp.2d 158, 161 (S.D.N.Y.2006) ("just as the defendant in Revson was barred from asserting an invalidity defense to royalty payments that accrued in respect of sales occurring prior to the filing of the in that action, so here VCT may not assert its [invalidity defense] to royalty payments that were [allegedly due] prior to the filing of this action.").[13] In this case, patent invalidity affects the ongoing contractual obligations of the parties.

 b. Under *Lear,* MedImmune Is Not Barred From Asserting Patent Invalidity.

Because the *Kohle* rule is inapplicable to the instant case, *Lear* controls this dispute. The distinction that MedImmune is a non-repudiating licensee is insufficient to depart from *Lear's* analysis. Where courts have distinguished *Lear,* they have done so due to a significant policy interest not considered by the Court in *Lear,* such as, for example, the importance of encouraging settlements, *see Flex–Foot,* 238 F.3d at 1367 (citing "the important policy of enforcing settlement agreements and res judicata must themselves be weighed against

the federal patent laws") (internal apostrophe omitted), or the inconsistency inherent when an *assignor* challenges the validity of his own patent, *see Diamond Scientific,* 848 F.2d at 1222 (noting that "[u]nlike the licensee, who, without *Lear* might be forced to continue to pay for a potentially invalid patent, the assignor who would challenge the patent has already been fully paid for the patent rights"). Where the Federal Circuit distinguished *Lear* in a patent license case in *Kohle,* it did so because the rationale for *Lear* was undermined where a licensee failed to challenge validity until the licensor discovered breach of the agreement. *See Kohle,* 112 F.3d at 1568. None of those policy-altering distinctions are relevant here.

In this case, where invalidity has been raised affirmatively by the licensee,[14] the *Lear* Court's reasoning applies in full force even though MedImmune has not repudiated the license: to prevent MedImmune from challenging the validity of the patent would give greater weight to the technicalities of contract doctrine than to federal patent policy. Because the Court definitively answered that question for patent license agreements like this one,[15] this is a case where the court will not "strike a

---

**13.** The Court expressly declines to reach the issue of whether MedImmune can recover *back* royalties (i.e. royalties already paid) if the patent is deemed invalid. As noted earlier, the Court also declines to address at this point whether MedImmune is immediately relieved of its contract obligation upon that event.

**14.** Also, the posture in which invalidity has been raised (i.e., a declaratory assertion of invalidity in this case, in contrast to defense of invalidity raised in *Lear*) has no significance as to the applicability of *Lear. See American Sterilizer,* 526 F.2d at 546.

**15.** Genentech's argument that this Court cannot "extend" *Lear* to this case because "there is no general federal common law," Defs.' Reply at 6, is unpersuasive. It has generally

been observed by the Supreme Court, the Federal Circuit, other courts, and commentators, that *Lear* spelled the end of the licensee estoppel doctrine. *See, e.g., Blonder–Tongue Labs., Inc. v. Univ. Of Ill. Foundation,* 402 U.S. 313, 345, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971) (*Lear* held that licensee estoppel was no longer tenable); *Diamond Scientific Co. v. Ambico, Inc.,* 848 F.2d at 1223; *Timely Prods., Inc. v. Costanzo,* 465 F.Supp. 91, 95 (D.Conn.1979); 6 D. CHISUM, CHISUM ON PATENTS § 19.02[3][a] at 19–92 (2005). Innumerable courts have applied the *Lear* principle to other scenarios, many of which dealt with facts far less analogous to the *Lear* than those at issue here. *See, e.g.,* Section III.B.2.b.ii, *supra.* To follow the Supreme Court's *Lear* decision is not to somehow create "federal common law."

balance which would result in an outcome different from that reached by the Supreme Court in *Lear.*" *American Sterilizer Co.,* 526 F.2d at 547.[16]

### D. Genentech's Motion for Summary Judgment On MedImmune's Fourth Cause of Action ("Non–Infringement") and MedImmune's Motion for Partial Summary Judgment.

#### 1. Arguments

MedImmune's Fourth Cause of Action seeks declaratory judgment that the Synagis product does not infringe the '415 Patent. Genentech asserts that MedImmune's admission that Synagis practices Claim 33 of the '415 Patent entitles it to summary judgment on this Cause of Action. MedImmune "does not dispute that the summary judgment on [the Fourth Cause of Action] ... should find infringement of Claim 33" based on this Court's claim construction order. However, MedImmune's motion asks the Court to find that Synagis does not infringe any claim of the '415 Patent except Claim 33, in light of the Court's claim construction and Federal Circuit case law.

#### 2. Analysis

Genentech must prevail on its motion because MedImmune has conceded that Synagis, but for the license agreement, infringes Claim 33 of the '415 Patent. The Court denies MedImmune's motion as moot, because Genentech's Covenant Not to Sue moots the controversy with respect to infringement of the other claims of the '415 Patent. *See Highway Equip. Co., Inc., v. FECO, Ltd.,* 469 F.3d 1027, 1033 n. 1 (Fed.Cir.2006).

### IV. CONCLUSION

In accordance with this order, the Court GRANTS Genentech's Motion for Partial Dismissal, DENIES MedImmune's Motion for Partial Summary Judgment, and GRANTS IN PART and DENIES IN PART Genentech's Motion for Summary Judgment. In effect, remaining before the Court are MedImmune's First Cause of Action for "Declaratory Judgment on Contractual Rights and Obligations"; MedImmune's Second Cause of Action for "Patent Invalidity," limited in scope to the invalidity of Claim 33; and MedImmune's Third Cause of Action for "Patent Unenforceability."

Subject to the agreement of the parties, the Court suggests that it could first adjudicate the validity of Claim 33 of the '415 Patent and MedImmune's Third Cause of Action for Patent Unenforceability. If the Court found that Claim 33 is invalid or that the patent is unenforceable, it could then examine the implications of those decisions on MedImmune's contractual obligations. The decisions as to the next steps of the litigation remain for discussion with the Court at a later time.

IT IS SO ORDERED.

---

16. Because the Court determines that licensee estoppel cannot impede MedImmune's invalidity cause of action due to *Lear,* it is not necessary to decide whether the licensee estoppel doctrine would apply under the terms of this particular license agreement.